[No. B147537. Second Dist., Div. Four. Feb. 13, 2002.]

MICHEL BENASRA et al., Plaintiffs and Appellants, v.
MITCHELL SILBERBERG & KNUPP, LLP, Defendant and Respondent.

**COUNSEL**

Fagelbaum & Heller, Philip Heller and Jerold Fagelbaum for Plaintiffs and Appellants.

Mitchell Silberberg & Knupp, Peter B. Gelblum and David A. Steinberg for Defendant and Respondent.

## OPINION

**CURRY, J.**—In this case we are asked to determine whether a claim for breach of duty of loyalty against the claimants' former attorneys for representing an opposing party in an arbitration should be foreclosed on res judicata grounds where the claimants had previously submitted an unsuccessful motion to disqualify to the arbitration panel. The trial court granted a defense motion for summary judgment, agreeing that the claim preclusion aspect of res judicata applied to the arbitration panel's denial of the motion to disqualify. We reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

*The Arbitration*

There is little dispute about the essential facts in this matter. Appellant Pour Le Bebe, Inc. (PLB) was a licensee of designer Guess? Inc. (Guess), operating numerous stores out of which it sold Guess-branded merchandise. For reasons not pertinent here, the relationship between the parties soured, and on May 21, 1999, Guess initiated an arbitration against PLB[1] before the American Arbitration Association, seeking to terminate the licensing agreement due to the alleged breach. Guess was represented by respondent law firm Mitchell Silberberg & Knupp, LLP.

It is clear that prior to May 1999, respondent had represented PLB in a few legal matters and had also performed substantial immigration work for principals and employees of the company and their family members. In May 1997, respondent had sent a letter to PLB containing terms of representation on a matter entitled *Mary K. Ready v. Michel Benasra, Pour Le Bebe. Inc.* (Super. Ct. L.A. County, 1997, No. BC169021). The letter stated that respondent "has represented and currently represents [Guess] and [its president], or entities affiliated with them . . . on matters other than those covered by this letter. Because we represent Guess, our representation of [PLB] could present certain conflicts of interest, and we will need the permission of [PLB] and Guess to undertake the concurrent representation of them under these circumstances. This letter seeks such permission, as set forth below."

---

[1]The principals of PLB operated another corporation known as Pour Le Maison, Inc., which was also a party to the arbitration. Pour Le Maison is not a party to the present litigation.

The letter also included the following paragraph: "At the present time, [respondent] is not aware of any conflicting interests among or between Guess and [PLB]. . . . If, at any time in the future, we conclude that there is a conflict of interest in representing [PLB] and Guess, we have the right to advise [PLB] of our belief and the reasons for that belief. Further, [PLB] understands and agrees that [respondent] may withdraw from representing [PLB] if we perceive a conflict of interest with Guess, and we may continue to represent Guess on all matters, including matters that are directly adverse to [PLB]. [PLB] further acknowledges that we may represent Guess (or any of its affiliated persons or entities) against [PLB] even if we have acquired confidential information from [PLB] relating to the subject matter of the dispute(s) between Guess and [PLB]. In some circumstances, the California Revised Rules of Professional Conduct may permit an attorney to continue to represent a party for whom a conflict of interest has been identified, and, with proper consents, we also reserve the right to take such an approach as we believe appropriate."

PLB was represented in the subject arbitration for a time by the law firm of Alschuler Grossman Stein & Kahan. In June 1999, an attorney from that office wrote to respondent stating: "[W]e have now been informed that your law firm has provided legal counsel to [PLB] and its affiliates or principals and may, itself, have an impermissible conflict of interest. Before we reach an opinion on this, however, I invite you to write me and describe for me the nature of your law firm's representation in the past and whether you believe your law firm has such a conflict. If you do not believe that such a conflict exists, please explain why. Needless to say, pending a better understanding of the facts, our client reserves all rights." Respondent wrote back saying, "[P]lease be advised that this firm's past representation of PLB was minimal, sporadic, and completely disassociated from and unrelated to the present dispute between Guess and PLB, consisting chiefly of immigration work and brief representation in an employment dispute. We never obtained any confidential information even remotely related to the present dispute." Alschuler wrote back seeking "all of the files in your law firm which were generated during the course of the representation of PLB and its principals . . . ."

Ironically, Alschuler was subsequently disqualified from representing PLB. In October 1999, a request for documents pertaining to respondent's representation of appellants was made by appellants' present counsel. In November, after several letters had been exchanged, respondent wrote that all of the files had been sent, except for internal billing files, which it refused to convey to PLB.

A formal motion to disqualify respondents from representing Guess was filed by PLB in the arbitration on December 17, 1999. Documents and

declarations were filed in support and in opposition. The panel of arbitrators heard argument at length on December 30, 1999. The panel denied the motion in writing on January 3, 2000, stating in its ruling: "There is insufficient evidence to support the disqualification of [respondent] as counsel in this proceeding." PLB sought an evidentiary hearing and asked that the panel order further production of documents from respondent. The panel denied the requests.

### The Complaint

PLB and its principals, appellants Michel Benasra and Denys Goulin, then filed a complaint against respondent. The complaint accused respondent of violating rule 3-310(C) of the California State Bar Rules of Professional Conduct, which provides that an attorney "shall not, without the informed written consent of each client: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or [¶] (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or [¶] (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter"; and rule 3-310(E), which provides that an attorney "shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

The complaint further alleged that respondent represented Benasra and Goulin in their individual capacities from approximately 1993 through "the present,"[2] represented PLB from 1993 through early 1999, and represented Benasra and Goulin in their capacities as sole shareholder, director, and officer of PLB (Benasra) and president of PLB (Goulin).[3] The complaint pointed out that in May 1997, respondent had sent the above described letter to PLB seeking waiver of potential conflicts due to its concurrent representation of Guess, and indicated that appellants did not sign the letter.

Appellants contended that respondent represented a client with an adverse interest, Guess, while it was representing appellants. Although the arbitration was initiated in May 1999 by respondent on Guess's behalf, the complaint contended that respondent also represented Guess in determining

---

[2] The complaint was filed in January 2000.

[3] Respondent has taken the position that it was first consulted by Guess with regard to its dispute with PLB on May 14, 1999, and that it advised PLB that it was ceasing further work on its behalf in mid-1997, although it continued to perform immigration work for family members and friends until 1998 or early 1999.

whether to terminate the licenses held by PLB sometime prior to the arbitration. Appellants further contended that as a result of its representation of each of them, respondent was privy to confidential information which precluded its representation of a client adverse to them even after the representation ceased.

*The TRO*

In conjunction with filing the complaint, appellants filed an ex parte application for temporary restraining order (TRO) and order to show cause re injunction. Declarations filed in support of the application described a number of legal matters in which appellants had obtained services or advice from respondent. The declarations stated that respondent had been given access to whatever it needed from the files of PLB and had also been provided copies of the individuals' tax returns. Benasra and Goulin expected to be witnesses in the arbitration and expressed concern about being cross-examined by their former attorneys.

At the hearing on the TRO on January 14, 2000, it was revealed that due to the assemblage of the moving papers, the trial court had missed some of the declarations and had not had an opportunity to read them. Nevertheless, the court denied the request because, regardless of what was stated in the declarations, the issue of whether to disqualify respondent had been presented to the arbitration panel. The court stated that only the panel had the power to rule on the question of "whether the party to the arbitration can be represented in that arbitration by [respondent] . . . ." The court did not set a hearing on a preliminary injunction.

*Renewal of Motion to Disqualify*

On January 14, 2000, PLB joined by the individual appellants renewed the motion to disqualify before the arbitration panel. The basis was the discovery of handwritten notes which purportedly showed that respondent was consulted about terminating PLB's licenses in November 1998. Counsel had stated in a declaration that "[p]rior to May 14, 1999, [respondent] had never represented or advised [Guess] in connection with any matter adverse to PLB. The first time [respondent] was contacted by [Guess] regarding a matter adverse to PLB was on May 14, 1999, in connection with [the arbitrated] dispute." The request was denied, the panel again stating that there was "insufficient evidence" to support the disqualification of respondent in the arbitration proceeding.

*Motion for Summary Judgment*

Respondent demurred to the complaint on the ground that the matter had been submitted to binding arbitration, and also sought a stay. The trial court

overruled the demurrer and denied the request for stay. In making its ruling the court stated: "My interpretation of it is they [appellants] were not voluntarily seeking to become parties of that arbitration. They were simply seeking relief for what they deemed to be an injustice. . . . I didn't see a voluntary submission of themselves as parties to the arbitration, and . . . arbitrators can't themselves determine what parties are subject to the arbitration, that's really for the court to do."

According to the record, Guess moved pursuant to Code of Civil Procedure section 170.6 to peremptorily challenge the assigned judge. The challenge was accepted, and the matter reassigned. Respondent then moved for summary judgment based solely on PLB's submission of the request to disqualify to the arbitrators. The material facts asserted were that Guess engaged respondent to initiate an arbitration against PLB on May 21, 1999; that Benasra and Goulin were material witnesses; that PLB asked the arbitrators to disqualify respondent on December 17, 1999, "after the parties had argued several motions, propounded and responded to discovery, and participated in numerous conferences with the Arbitrators"; that the arguments made to the arbitrators with regard to disqualification were echoed in the complaint; that the disqualification motion was decided after briefing and a three-hour hearing; that PLB sought reconsideration on January 4, 2000, and requested an evidentiary hearing which was opposed and denied; that the trial court refused to issue a TRO or set a hearing on a request for preliminary injunction; that on the day the court ruled on the TRO, appellants filed another motion to disqualify respondent in the arbitration, "submitt[ing] the verified Complaint in this action to the Arbitrators, as well as the declarations and purported evidence that they had submitted to [the court] in support of the TRO application"; that after the motion was denied, the arbitration commenced and an award was issued in favor of Guess; and that on June 8, 2000, the arbitrators issued a final award which stated that the disqualification motions were denied after consideration of "the evidence and arguments offered by each side."[4] Some of these facts were subject to minor dispute, but appellants essentially agreed that the described incidents had transpired.

The court ruled that appellants' claims against respondent were "barred by the doctrine of *res judicata*," that "the alleged conflict asserted by [appellants] as the basis of their complaint, was fully submitted to, litigated in, and finally decided in the underlying arbitration proceedings," and that "[a]ll of [appellants'] claims in the lawsuit relate to and are derivative of the claims

---

[4]The final award stated: "[PLB] sought disqualification of [respondent]. A hearing was conducted and the arbitrators considered the evidence and argument offered by each side. It was determined that there was insufficient evidence presented to support the motion."

asserted by [appellants] in the arbitration, and are based on the same primary right." The court specifically found that Benasra and Goulin were in privity with PLB and "voluntarily joined the arbitration proceedings by seeking the relief sought there against [Guess] and [respondent]." Judgment was entered in favor of respondent and this appeal followed.

DISCUSSION

I

The sole issue on appeal is whether summary judgment was properly granted on res judicata grounds. The parties do not discuss in their briefs the substantive merits of the claim that respondent breached a duty of loyalty owed to appellants. Respondent moved for summary judgment on the basis that all of the facts alleged in the complaint were true. Therefore, we do not address the merits of the case, and nothing said here is intended to express any view on whether or not appellants' claims have substantive merit.

■ "The doctrine of res judicata gives certain conclusive effect to a former judgment in subsequent litigation involving the same controversy. It seeks to curtail multiple litigation causing vexation and expense to the parties and wasted effort and expense in judicial administration. It is well established in common law and civil law jurisdictions, and is frequently declared by statute." (7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 280, p. 820, italics omitted.) "The doctrine has 'a double aspect': [¶] First, in a new action on the same cause of action, a prior judgment for the defendant is a complete bar [citation]. A prior judgment for the plaintiff likewise precludes the new action because it results in a merger, superseding the plaintiff's claim by a right of action on the judgment [citation]. [¶] Second, in a new action on a different cause of action, the former judgment is not a complete merger or bar, but is effective as a collateral estoppel, i.e., it is conclusive on issues actually litigated between the parties in the former action." (*Id.*, § 281, p. 821, italics omitted.)

■ The primary aspect of res judicata is sometimes referred to as " 'claim preclusion' "; the secondary aspect is referred to as "collateral estoppel" or " 'issue preclusion.' " (7 Witkin, Cal. Procedure, *supra*, § 282, p. 822, italics omitted.) " 'The rule of claim preclusion, [citation], is that a party ordinarily may not assert a civil claim arising from a transaction with respect to which he has already prosecuted such a claim, whether or not the two claims wholly correspond to each other. The rule of issue preclusion, sometimes referred to as collateral estoppel, [citation], is that a party ordinarily may not relitigate an issue that he fully and fairly litigated on a previous occasion.' " (*Ibid.*, italics omitted.)

██ The parties agree that collateral estoppel cannot be used to foreclose later litigation on *issues* decided by private arbitrators. That principle was conclusively established by the Supreme Court in *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815 [88 Cal.Rptr.2d 366, 982 P.2d 229], where two parties, a lessor and lessee, had submitted their dispute over underground pollution to binding arbitration. The arbitrator found that the discharge of contaminants was not sudden and accidental. In later litigation, the lessee's insurers attempted to use the arbitrator's factual determination to preclude the lessee's claim for indemnity under his policies. The insurers contended that the lessee's "relitigation of the 'sudden and accidental' issue was precluded by principles of collateral estoppel." (*Id.* at p. 827.) The Supreme Court disagreed.

First, the court noted that "even where the minimal prerequisites for invocation of the doctrine are present, collateral estoppel ' "is not an inflexible, universally applicable principle; policy considerations may limit its use where the . . . underpinnings of the doctrine are outweighed by other factors." ' " (*Vandenberg v. Superior Court, supra,* 21 Cal.4th at p. 829.) "Whether collateral estoppel is fair and consistent with public policy in a particular case depends in part upon the character of the forum that first decided the issue later sought to be foreclosed. In this regard, courts consider the judicial nature of the prior forum, i.e., its legal formality, the scope of its jurisdiction, and its procedural safeguards, particularly including the opportunity for judicial review of adverse rulings." (*Ibid.*) Moreover, the court stated, "a particular danger of injustice arises when collateral estoppel is invoked by a nonparty to the prior litigation. [Citations.] Such cases require close examination to determine whether nonmutual use of the doctrine is fair and appropriate." (*Id.* at pp. 829-830.)

The court described the arbitral forum as "informal," "expeditious," and "sometimes roughshod." (*Vandenberg v. Superior Court, supra,* 21 Cal.4th at p. 831.) "The traditional rule is that ' "[a]rbitrators, unless specifically required to act in conformity with rules of law, may base their decision upon broad principles of justice and equity, and in doing so may expressly or impliedly reject a claim *that a party might successfully have asserted in a judicial action.*" [Citations.] As early as 1852, this court recognized that, "The arbitrators are not bound to award on principles of dry law, but may decide on principles of equity and good conscience, and make their award *ex aequo et bono* [according to what is just and good]." [Citation.] "As a consequence, . . . '[p]arties who stipulate in an agreement that controversies . . . shall be settled by arbitration, may expect not only to reap the advantages that flow from the use of that nontechnical, summary procedure, but also to find themselves bound by an award reached by paths neither

marked nor traceable and not subject to judicial review.' [Citation.]" ' " (*Id.* at pp. 831-832, quoting *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10-11 [10 Cal.Rptr.2d 183, 832 P.2d 899].)

While the "informal and imprecise" nature of private arbitration and its "insulation from judicial interference," are " ' "the very advantages the . . . parties [seek] to achieve" ' in arbitrating *their own claims* [citation], these same features can be serious, unexpected disadvantages if issues decided by the arbitrator are given leveraged effect in favor of strangers to the arbitration." (*Vandenberg v. Superior Court, supra,* 21 Cal.4th at p. 832, quoting *Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 10.) An agreement to arbitrate specific claims "reflects each party's conclusion that the immediate stakes make it preferable to avoid the delay and expense of court proceedings, and instead to resolve the matter between themselves without resort to the judicial process. Under such circumstances, each party is willing to risk that the arbitration will result in a 'final' and 'binding' *defeat* with respect to *the submitted claims,* even though the party would have won in court, and even though the arbitrator's errors must be accepted without opportunity for review. [Citation.] But this does not mean each arbitral party also consents that issues decided against him by this informal, imprecise method may bind him, in the same manner as a court trial, in *all future* disputes, *regardless* of the stakes, against *all* adversaries, known and unknown. [¶] . . . *The very fact* that arbitration is by nature an informal process, not strictly bound by evidence, law, or judicial oversight, suggests reasonable parties would hesitate to agree that the arbitrator's findings in their own dispute should thereafter bind them in cases involving different adversaries and claims." (*Vandenberg, supra,* at p. 832.)

For these reasons, the court held that determinations on particular legal or factual issues made in private arbitrations would not be given collateral estoppel effect unless the parties clearly agreed otherwise. The court was satisfied that its decision would not negatively impact the important policies in favor of collateral estoppel, such as preserving the integrity of the judicial system, promoting judicial economy, and protecting litigants from harassment by vexatious litigation: "[B]ecause a private arbitrator's award is *outside* the judicial system, denying the award collateral estoppel effect has no adverse impact on judicial integrity. Moreover, because private arbitration does not involve the use of a judge and a courtroom, later relitigation does not undermine judicial economy by requiring duplication of judicial resources to decide the same issue. Finally, when collateral estoppel is invoked by a *nonparty* to the private arbitration, the doctrine does not serve the policy against harassment by vexatious litigation. In such cases, the

doctrine is asserted not to protect one who has already once prevailed against the same opponent on the same cause of action, but simply to gain vicarious advantage from a litigation victory *won by another*." (*Vandenberg v. Superior Court, supra,* 21 Cal.4th at p. 833.)

While the court was clear that an arbitration decision could have no collateral estoppel effect on later litigation, the court recognized that claim preclusion was a different matter, stating in a footnote: "Nothing in our decision imposes or implies any limitations on the strict res judicata, or 'claim preclusive,' effect of a California law private arbitration award." (*Vandenberg v. Superior Court, supra,* 21 Cal.4th at p. 824, fn. 2.) The court cited two appellate court decisions illustrating the distinction: *Thibodeau v. Crum* (1992) 4 Cal.App.4th 749 [6 Cal.Rptr.2d 27] and *Sartor v. Superior Court* (1982) 136 Cal.App.3d 322 [187 Cal.Rptr. 247].

In *Thibodeau v. Crum, supra,* 4 Cal.App.4th 749, homeowners arbitrated claims for construction deficiencies against their general contractor pursuant to a contractual provision governing disputes arising out of the construction project. After deducting damages for poor workmanship and unexcused delays, the arbitrator awarded $20,660 to the general contractor. Noting that "arbitrating parties are obliged . . . to place before their arbitrator all matters within the scope of the arbitration, related to the subject matter, and relevant to the issues" (*id.* at p. 755), the appellate court reversed a judgment entered in favor of the homeowners in a later litigation brought against the cement work subcontractor. The court explained the basis for its decision: "The subcontract was subject to the . . . construction contract, which provided that disputes arising out of the project be resolved by arbitration. In fact, the [homeowner/general contractor] arbitration concerned work done not only by [the general contractor] directly but also by subcontractors engaged by [it]. . . . [T]he parties in this case anticipated the involvement of third parties, i.e., subcontractors, at the time the construction contract was executed and the arbitration was intended to resolve disputes arising out of work of such third parties." (*Id.* at p. 761.)

In *Sartor v. Superior Court, supra,* 136 Cal.App.3d 322, the plaintiffs brought claims against an architectural firm and three of its employees for fraud, negligence, breach of contract, and warranty. The dispute with the firm was ordered into arbitration, and the arbitrator, finding no fraud but agreeing there were defective gaskets in a solar collector, awarded a small sum to the plaintiffs. The plaintiffs thereafter sought to continue the litigation against the employees. When summary judgment sought on res judicata grounds was denied, the employees petitioned for writ relief. The Court of

Appeal granted the writ, holding that "[s]ince a corporation may act only through its agents, a finding that the corporation was liable only for the defective gaskets on the solar collector can be pleaded by petitioners as res judicata in the subsequent action against them."[5] (*Sartor*, at p. 328.)

Citing *Thibodeau*, *Sartor*, and the footnote in *Vandenberg*, the court in a more recent case affirmed summary judgment on claims brought by an investor against an investment company on res judicata grounds. The plaintiff investor in *Brinton v. Bankers Pension Services, Inc.* (1999) 76 Cal.App.4th 550 [90 Cal.Rptr.2d 469], had previously arbitrated a claim against one of the investment company's officers who also worked as a broker for a securities dealership. The broker/officer had recommended investments in five limited partnerships, all of which subsequently failed. The arbitration panel denied the investor's claims for fraud, misrepresentation, and breach of fiduciary duty. The appellate court concluded that the arbitration claim and the lawsuit sought recovery for the same injury based on violation of the same primary right and for that reason, assertion of the claim preclusion bar was appropriate: "The allegations of wrongful conduct contained in the two pleadings are virtually identical. Both the claim and the complaint alleged plaintiff suffered financial losses because of [the broker's] purported misrepresentations concerning the character of the investments. Each sought to hold [the securities dealership] and defendant liable based on the allegation [the broker] was acting as each entity's agent when he made the purported misrepresentations. . . . [¶] Defendant was not a party to the arbitration proceeding. But since defendant's liability is merely derivative of [the broker's], it is unnecessary for defendant to have been a party to the prior action to assert a claim preclusion defense in this case." (*Id.* at pp. 557-558.)

## II

In light of the distinction drawn by these authorities, the crucial issue here is whether the arbitrators' denial of the motion to disqualify was properly asserted as a complete bar to the present action for breach of duty of loyalty, or whether the trial court improperly used the arbitration panel's determination of a legal or factual issue for collateral estoppel purposes in violation of *Vandenberg*.

Respondent argues we should use the primary rights analysis to determine whether the two proceedings involved the same claim or cause of action.

---

[5] Although the Court of Appeal elsewhere indicated that the employees' defense was based on "collateral estoppel" (*Sartor v. Superior Court, supra,* 136 Cal.App.3d at pp. 327-328), the Supreme Court in *Vandenberg* identified *Sartor* as a case involving claim preclusion. (*Vandenberg v. Superior Court, supra,* 21 Cal.4th at p. 824, fn. 2.)

(See *Brinton v. Bankers Pension Services, Inc., supra*, 76 Cal.App.4th at p. 557 ["Under the primary rights theory '. . . the invasion of one primary right gives rise to a single cause of action. [Citations.]' [Citation.] ' "[A] cause of action consists of 1) a primary right possessed by the plaintiff, 2) a corresponding primary duty devolving upon the defendant, and 3) a delict or wrong done by the defendant which consists in a breach of such primary right and duty. . . .' " [Citation.] The existence of a cause of action 'is based upon the harm suffered, as opposed to the particular theory asserted by the litigant.' "].) Respondent maintains that "Appellants asserted the same violation of the same primary right that they asserted in the Arbitration—the purported right to [respondent's] undivided loyalty and confidentiality. In both forums, Appellants also alleged the same duty, wrong, and harm—that [respondent] breached its duties of loyalty and confidentiality by representing Guess adversely to them and disclosing confidential information, and that these breaches prejudiced their ability to defend themselves in the Arbitration."

Respondent is overlooking an important step. Before we can compare the present claim with the claim or cause of action asserted in the first forum, we must identify the cause of action or claim asserted there. The arbitration involved claims and counterclaims between PLB and Guess, which were disputing product-licensing agreements. The question of whether a conflict prevented Guess's attorneys of choice—respondent law firm—from representing Guess in the arbitration was raised as an ancillary or collateral issue. (See *Meehan v. Hopps* (1955) 45 Cal.2d 213, 216-217 [288 P.2d 267] ["The matter of disqualification of counsel is unquestionably collateral to the merits of the case. . . . [T]he test is whether the matter is '. . . important and essential to the correct determination of the main issue. . . .' It requires no argument to demonstrate that the question of disqualification of counsel bears *no relation to the main issue in the present case*."].)[6] From appellants' perspective, the motion to disqualify lacked the most elemental aspect of a claim—an attempt to obtain damages or any other type of relief.

Respondent attempts to persuade us that appellants had relief available in the arbitration proceeding because a motion for disqualification is the

---

[6]The determination that a motion to disqualify counsel was collateral to the merits led the court in *Meehan* to conclude that denial of the motion was immediately appealable. Because of the availability of this avenue of relief, it may be that denial of a motion to disqualify in a civil lawsuit will have collateral effect. (See *Reich v. Club Universe* (1981) 125 Cal.App.3d 965 [178 Cal.Rptr. 473] [where attorney was disqualified in one lawsuit from representing class of tourists dissatisfied with their accommodations on a cruise holiday because he was likely to be a percipient witness, trial court properly prevented attorney from representing same class in second lawsuit involving the same incident on res judicata grounds].) Here, because of the nature of arbitration, no appeal was available from the panel's decision.

functional equivalent of a request for permanent injunction. In *Reed v. Superior Court* (2001) 92 Cal.App.4th 448 [92 Cal.App.4th 1346b, 111 Cal.Rptr.2d 842], this court, in concluding that an appeal from denial of a motion to disqualify did not automatically stay trial court proceedings, analogized a motion to disqualify to a request for a *preliminary* injunction. (*Id.* at p. 454 [noting that "a preliminary injunction is a provisional remedy 'distinct from the main action' " and that "[t]his is consistent with *Meehan's* description that an appeal from an order denying disqualification involves a 'collateral' matter."].) The analogy to a preliminary injunction seems more apt. ■ "A permanent injunction is an equitable remedy for certain torts or wrongful acts of a defendant where a damage remedy is inadequate. A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action for tort or other wrongful act against a defendant and that equitable relief is appropriate. A permanent injunction is not issued to maintain the status quo but is a final judgment on the merits. [Citation.] It is reviewed on appeal for the sufficiency of the evidence to support the judgment." (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 646 [4 Cal.Rptr.2d 689].)

■ In determining whether to grant a preliminary injunction, on the other hand, "the trial court considers whether the plaintiff has a likelihood of succeeding on the merits and whether the plaintiff will suffer greater interim harm from a denial of the injunction pendente lite than the defendant is likely to suffer from its grant. The granting or denial of a request for a pendente lite injunction does not determine the merits of the controversy and is reviewed by an appellate court for an abuse of discretion." (*Art Movers, Inc. v. Ni West, Inc., supra,* 3 Cal.App.4th at p. 646.) ■ Determination of a motion to disqualify similarly requires a balancing of interests between " 'the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility.' " (*Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.* (1995) 36 Cal.App.4th 1832, 1838 [43 Cal.Rptr.2d 327].) It is also reviewed on appeal under an abuse of discretion standard. (*Ibid.*) Like a preliminary injunction, a motion to disqualify is intended to prevent immediate, irreparable harm. It is decided summarily, on declarations and documentary evidence, generally without an evidentiary hearing. Often there is little opportunity for discovery. More significantly, if the moving party prevails, it obtains a ruling precluding the attorney from undertaking representation of a single client in a single matter. Unlike a permanent injunction, an order of disqualification contains no broad or general prohibition against accepting representation of certain categories of clients or certain categories of disputes.

██ Another important element missing in the proceedings before the arbitration panel was the party who allegedly caused the injury. Respondent was not a party to the arbitration dispute. As attorney of record, respondent opposed the motion to disqualify on Guess's behalf—not on its own behalf. If withdrawing from representation or refraining from opposing the motion would have strategically benefited Guess, respondent would have been obliged to do so. Guess, as the client, had complete authority to ask respondent to step aside, and could have turned the motion over to another law firm or in house counsel to oppose. Respondent had no right to be involved in the motion to disqualify or any aspect of the arbitration except at Guess's request.

On the question of whether determination of a motion in a prior action can lead to claim preclusion for res judicata purposes, we find the decision in *Davis & Cox v. Summa Corp.* (9th Cir.1985) 751 F.2d 1507, instructive. There, a law firm brought a collection action against a corporation. The corporation counterclaimed, alleging that the firm had breached its fiduciary duty and committed malpractice. The district court dismissed the portion of the counterclaim which related to malpractice allegedly committed in the course of representation in a prior litigation by giving preclusive effect to a ruling in the prior action denying the motions of the corporation and other similarly situated parties to vacate default judgments. The district court reasoned that, in denying the motions, the court in the prior action must have found that the law firm did not commit malpractice. (*Id.* at p. 1517.)

The Ninth Circuit Court of Appeals reversed, holding that "[t]he district court improperly applied res judicata to preclude litigation of [the corporation's] counterclaim." (*Davis & Cox v. Summa Corp., supra,* 751 F.2d at p. 1518.) The court explained: "[The corporation] and the [law firm] were not true adversarial parties in the [prior] case. None of the [law firm] Parties was a formal party to the motion to vacate. Significantly, even if the [law firm] Parties could be viewed as parties to the motion, neither [the corporation] nor the [law firm] Parties filed a formal claim against each other. [Citation.] Res judicata is inapplicable because there was no adjudication 'between the same parties on *any* cause of action let alone the same cause of action.' [Citations.] [¶] In addition, [the corporation] could not have joined its malpractice claim to the motion to vacate. [The corporation] could only have filed a cross-claim against the [law firm] Parties for a claim 'arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or relating to any property that is the subject matter of the original action.' Fed.R.Civ.P. 13(g). [The corporation's] malpractice claim against the [law firm] Parties was not the subject of

[the prior plaintiff's] original suit or of any counterclaim. [The corporation], therefore, should not be barred from raising that claim here. *See* Restatement (Second) of Judgments §§ 25 comment f, 26 comment c (1982) (claimant should not be precluded in second action from raising claims which he was unable to present in first action)." (*Davis & Cox v. Summa Corp., supra,* 751 F.2d at p. 1518.)

Like the corporation in *Davis & Cox,* appellants had no real opportunity to assert a claim against respondent in the arbitration. If relevant PLB confidences already had been revealed, disqualification would not have made appellants whole, and there is no rule which permits a party to an arbitration to unilaterally bring in claims for damages it may have against a third party, even when the third party is the claimant's attorney. Moreover, neither appellants nor respondent had agreed to arbitrate disputes arising out of the legal representation.[7] We have no doubt that had the panel's decision gone the other way, respondent would have denied that it was bound for the reasons we have set forth—it was not a party to the arbitration contract or the dispute, it had no right to control the arbitration, the decision was made summarily without opportunity for an evidentiary hearing, etc.

The holding in *Davis & Cox* was based on the common law exception to the general rule in favor of res judicata set forth in section 26, subdivision (1)(c) of the Restatement Second of Judgments: "When any of the following circumstances exists, the general rule . . . does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant: [¶] . . . [¶] (c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the [tribunal] . . . , and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief[.]" Several California courts have reached similar conclusions on more pragmatic grounds.

In *Rohrbasser v. Lederer* (1986) 179 Cal.App.3d 290 [224 Cal.Rptr. 791], appellant Rohrbasser had been sued in a prior action and default judgment had been entered against him. He sought to have the default set aside on the ground of extrinsic fraud, claiming that the plaintiff's lawyer had told him that he had been named as a technicality and that the plaintiff would not go against him. The trial court in that prior litigation denied the motion to vacate because "there was an insufficient showing of extrinsic fraud based

---

[7]At least, no signed arbitration agreement has been brought to our attention.

on the declarations before the court . . . ." (*Id.* at p. 294.) Rohrbasser was subsequently sued in an action to set aside a fraudulent conveyance and brought a cross-complaint, making essentially the same allegations as were made in the earlier motion to vacate the default. He contended that the denial of the motion to vacate did not bar the cross-complaint "since he did not present any oral testimony at the hearing on the prior motion to vacate" and "the issues were not fully developed . . . ." (*Id.* at p. 295.) The respondent argued that in order to prevail on that basis, Rohrbasser should have requested the right to present oral testimony and had that request denied or limited—echoing a similar argument made by respondent here. The appellate court disagreed: "One could reason that such a requirement would save judicial resources and avoid imposing needless expenses and burdens on the opposing party. But such a requirement would have the opposite effect." (*Id.* at p. 299.) The court reasoned that since it would be very difficult to persuade a court to hold an evidentiary hearing in such situations, the litigant would avoid the whole issue until it could pursue full-blown litigation, and "instead of resulting in the gainful use of judicial time, summary disposition of issues by motion would have been effectively eliminated." (*Id.* at p. 300.)

*Rohrbasser* was followed in *Wright v. Ripley* (1998) 65 Cal.App.4th 1189 [77 Cal.Rptr.2d 334], where an attorney sued his former client and the client's insurer for malicious prosecution. In the prior litigation for malpractice, the attorney had obtained summary judgment and sought sanctions pursuant to Code of Civil Procedure section 128.5. The trial court had denied the sanction request "because it could not say the case 'was frivolous and in bad faith.' " (*Wright, supra,* at p. 1192.) After the malicious prosecution case was filed, the defendants moved for judgment on the pleadings on the ground that the court's refusal to award sanctions in the underlying case estopped the attorney from proving the malice element of the claim. (*Id.* at p. 1193.) The trial court agreed and granted the motion. The Court of Appeal reversed. Noting that "collateral estoppel should not be applied if there was no opportunity for a full presentation of the issue in the first proceeding" (*ibid.*), the court concluded that because sanctions motions are denied summarily on declarations, without testimony and evidentiary hearing, the proceeding should not be given collateral effect in a later litigation in which the issue of bad faith is involved. "[I]f collateral estoppel effect were given to the denial of such motions, it would also have to be given when they are granted. It is difficult to imagine the extent to which judicial economy would be compromised if every lawyer against whom sanctions were sought understood that such an award would constitute a binding adjudication on issues of his or her unprofessional conduct. Regular court business would grind to a halt while lawyers exercised their full due process rights to fight the charges." (*Id.* at p. 1195.)

The rationale applies equally here. If every motion to disqualify counsel became a life or death struggle between the attorney and the prior client, then the parties to the main proceeding would have to stand aside while the issue was fully addressed by discovery, testimony, etc. It is far more efficient to give a party a summary opportunity to prove as a collateral issue in an ongoing litigation that the attorney representing the opposite side has breached a duty of loyalty owed to the party. If the motion to disqualify succeeds, there will generally be no need for later litigation and considerable judicial economy will have been achieved. But if the party knows it may be penalized for initiating a motion to disqualify by being denied a later forum in which to fully develop the facts and litigate the issue head on, fewer motions will be made and an opportunity to prevent attorney breaches of duty of loyalty before they occur will be lost. From a practical standpoint, it makes more sense to have summary resolution in the ongoing proceeding and a full and fair litigation later if need be.

Respondent contends that *Wright* and *Rohrbasser* and other similar cases should be disregarded because they are "collateral estoppel (issue preclusion) cases . . . ." Respondent correctly describes the nature of the res judicata issue in those cases but is incorrect in its belief that they are, therefore, irrelevant. Appellants have never had an opportunity to prosecute a full-blown claim for breach of duty of loyalty against respondent in any forum. The single issue of whether the representation of Guess in the arbitration required use of confidential information was presented in summary fashion to the panel of arbitrators. On these facts, there was no true claim presented against respondent in the arbitration, and the claim preclusion aspect of res judicata is inapplicable.

In a somewhat different vein, respondent attempts to persuade us that appellants should be foreclosed from pursuing the present litigation because their repeated requests to disqualify respondent from representing Guess were equivalent to "voluntary submi[ssion of] the disqualification issue to the Arbitrators." We fail to see how appellants' actions can be deemed voluntary. PLB agreed to arbitrate its contractual claims against Guess, but it did not agree to arbitrate its claims with respondent or to allow Guess to have access to confidential information through employment of PLB's former counsel.[8] (See *County of Contra Costa v. Kaiser Foundation Health*

---

[8]Respondent's attempt to rely on cases in which attorney fee awards were submitted to arbitration is misplaced. In both *Moshonov. v. Walsh* (2000) 22 Cal.4th 771 [94 Cal.Rptr.2d 597, 996 P.2d 699] and *Moore v. First Bank of San Luis Obispo* (2000) 22 Cal.4th 782 [94 Cal.Rptr.2d 603, 996 P.2d 706], the contracts at issue contained both a binding arbitration

*Plans, Inc.* (1996) 47 Cal.App.4th 237, 245 [54 Cal.Rptr.2d 628] ["California has no policy of compelling persons to accept arbitration of controversies that they have not agreed to arbitrate."]; *Vandenberg v. Superior Court, supra,* 21 Cal.4th at pp. 832-833 ["Even where . . . the arbitral parties have imposed some formality on their proceedings, have aired their dispute thoroughly, and have received a detailed decision, there is no reason to assume they agreed to 'issue preclusive' effect in favor of nonparties. . . . [¶] . . . A general rule that confirmed that private arbitration awards may have such effect would thus violate the fundamental premise that private arbitration is a contractual proceeding *whose scope and effect are defined and limited by the parties' consent.*"].)

When a party to an arbitration hires an attorney who possesses confidential information concerning the opposing party, the opposing party is placed in an unconscionable quandary. If it allows the arbitration to go forward without objection, it will render itself vulnerable to a later assertion of waiver (see *River West, Inc. v. Nickel* (1987) 188 Cal.App.3d 1297, 1313 [234 Cal.Rptr. 33]); if it objects, it will have no guarantee that the full panoply of litigation resources will be made available by the arbitrators and it may be unable to uncover the evidence it needs to prove that the conflict exists. Unscrupulous parties could take advantage of the situation by bringing in counsel having potential conflicts at the last minute, before the opposing parties can marshal the facts to support a motion to disqualify, and after the minds of the arbitrators are turned to the substantive claims. Respondent argues that appellants could have foregone submission of the motion to the arbitrators in favor of an immediate request for a TRO, and if that proved unsuccessful—as it did in the present case—an appeal of the denial order. That is hardly a recipe for judicial economy. Preliminarily, it is clear that a denial of a TRO or preliminary injunction is not res judicata in an appeal from the final judgment. (*Bomberger v. McKelvey* (1950) 35 Cal.2d 607, 612 [220 P.2d 729].) More importantly, the party raising the conflict issue should not be discouraged from having it addressed in the first instance by the tribunal most familiar with the facts—the arbitration panel. That echoes the situation found in *Wright* and *Rohrbasser,* where the courts handling the initial litigation provided a summary opportunity for the litigants to prove their case for the existence of bad faith and fraud, respectively. The claimants were nonetheless permitted to proceed with full-blown claims in later litigation. We see no reason why appellants should not be afforded the same opportunity here.

---

clause and an attorney fee provision. Thus, the issue of whether or not to award attorney fees in any amount was fully arbitrable.

## DISPOSITION

The judgment is reversed, and the case remanded for further proceedings. Appellants are to recover their costs on appeal.

Vogel (C. S.), P. J., and Epstein, J., concurred.

A petition for a rehearing was denied March 12, 2002, and respondent's petition for review by the Supreme Court was denied May 22, 2002. George, C. J., and Baxter, J., did not participate therein.