Filed 11/22/13  P. v. Trueblood CA3

<u>**NOT TO BE PUBLISHED**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C071865 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF 12-0289) |
| v. | |
| BENJAMIN SAMUEL TRUEBLOOD, | |
| Defendant and Appellant. | |

A first amended information charged defendant Benjamin Samuel Trueblood with possession of marijuana for sale (Health & Saf. Code, § 11359—count 1); cultivation of marijuana (Health & Saf. Code, § 11358—count 2); possession of hydrocodone (Health & Saf. Code, § 11350, subd. (a)—count 3); being a felon in possession of a firearm (Pen. Code, § 29800, subd. (a)(1)—count 4);[1] possession of an explosive or destructive device (*id.,* § 18710—count 5); and possession of ammunition by a prohibited person (*id.,* § 30305, subd. (a)(1)—count 6).  As to counts 1 through 3, it was alleged that defendant

---

[1] Undesignated statutory references are to the Penal Code.

was armed with a firearm (*id.,* § 12022, subd. (a)(1)). As to all counts, it was alleged that defendant had sustained a prior serious felony conviction. (*id.,* § 667, subd. (d).)

The first amended information also charged codefendant Kyle Shawn Trueblood[2] with committing counts 1 and 2, and with receiving stolen property, namely copper wire (§ 496, subd. (a)—count 7), and possessing burglary tools, a misdemeanor (§ 466—count 8).

After defendant's motion to suppress evidence (§ 1538.5) was denied, defendant pleaded no contest to count 3 (possession of hydrocodone) and the firearm enhancement on that count and admitted the prior strike, in return for the dismissal of the remaining counts and enhancements and a stipulated state prison term of five years.

Defendant contends the trial court erred by denying his motion to suppress evidence. According to defendant, the warrantless entry into his home and the subsequent warrantless entry into his locked bedroom were unlawful. We shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Although Kyle is not a party to this appeal, we must discuss his case at the start. Law enforcement officers came to defendant's house to investigate Kyle, not defendant. Before defendant's motion to suppress evidence was heard, there was a preliminary hearing as to both defendants and a hearing on Kyle's prior motion to suppress evidence (which is not in the record). Finally, in denying defendant's motion to suppress, the magistrate partly relied on the prior ruling denying Kyle's motion.

Neither defendant nor Kyle testified at any of the hearings.

---

[2] The codefendant, defendant's brother, is not a party to this appeal. For the sake of clarity and intending no disrespect, we shall refer to him as Kyle.

*The Evidence in Kyle's Case*

Around 2:00 p.m. on January 23, 2012, Yolo County Sheriff's Deputy Hector Bautista was on patrol in the town of Dunnigan, driving an unmarked patrol car but wearing clothing that bore the words "sheriff" and "police," with his partner, Yolo County Probation Department Officer Eli Weddell.[3] Bautista saw Kyle walking by the roadside, carrying an open can that apparently contained an alcoholic beverage. The officers pulled over and contacted Kyle.

Kyle said he found the can by the roadside. Seeing ants crawling on top of the can, Deputy Bautista concluded that Kyle had not been unlawfully drinking from it.

Deputy Bautista asked Kyle if he was on parole or probation.[4] Kyle said he was on probation for theft. He did not say he was on *searchable* probation, and Bautista did not check on that until after Kyle was arrested. Bautista then learned that Kyle's probation had no search condition.[5]

Deputy Bautista asked Kyle if he had anything illegal on his person or in his backpack; Kyle said no. Bautista asked permission to search Kyle's pocket. Kyle said: "Go ahead. I don't have anything in there." Bautista found no contraband or weapons on Kyle's person.

---

[3] The People assert incorrectly that Deputy Bautista was in "uniform" and driving "a marked patrol car." Bautista testified clearly that he was driving an unmarked car and had "identifiable police gear on" but was not wearing a "deputy sheriff uniform."

[4] Deputy Bautista "typically" or "always" asked that question of people he did not know. It was "just a habit" he had when he came in contact with people in the course of his duties.

[5] Deputy Bautista first disclosed this fact near the end of Kyle's section 1538.5 hearing. The magistrate commented: "[T]his is actually now a much more problematic case than I earlier thought because my initial inclination, to be honest, was assuming there was a search condition . . . ."

3

Kyle handed his backpack to Deputy Weddell.  According to Deputy Bautista, Kyle simultaneously "just kind of motioned, turned around, faced his back towards me, and put his hands out to the side," which Bautista took as consent to search.

Searching the backpack, Officer Weddell found a pair of bolt cutters, a pry bar, tin snips, pliers, and screwdrivers; he also found pieces of small wire, including one large roll or coil about 10 feet in length that was covered in insulation, contained copper, had dried mud or dirt on it, and appeared freshly cut.[6]  In Deputy Bautista's experience, the tools found in the backpack, when possessed together, are normally used for burglary. Furthermore, Bautista knew of recent reports of local copper thefts, and copper thieves he had contacted possessed similar tools.

Deputy Bautista asked Kyle where he got the coil of wire.  Kyle said he got it from an RV in a friend's back yard, with permission.

Yolo County Sheriff's Sergeant Orrin Heatlie, on patrol in a marked police car and in full uniform, heard over the radio that Deputy Bautista and Officer Weddell were with a subject and needed to follow up on an investigation.  Proceeding to the scene, Heatlie found Kyle and the officers standing by the side of the road.  While the officers checked out Kyle's story about the wire, Heatlie detained him in the back of the sergeant's patrol car.

Sergeant Heatlie asked Kyle where he lived and with whom.  Heatlie also asked Kyle twice whether he was on probation; Kyle replied that he was on probation for possession of "weed."  Heatlie then asked whether Kyle had any more "weed" with him

---

[6] The People assert erroneously that Deputy Bautista searched the backpack.

or in his possession back at his house.  He did not *Miranda*ize[7] Kyle because he assumed another officer had already done so.[8]

In checking out Kyle's story about the copper wire, Deputy Bautista and Officer Weddell found nothing on Kyle's friend's property that appeared to have had any wire freshly cut from it.  The officers returned to the scene of Kyle's detention.  Based on what Sergeant Heatlie told them, the officers proceeded to Kyle's residence, which was also defendant's residence; Kyle was transported there in the back of Heatlie's patrol car.

During the hearing on Kyle's prior motion to suppress evidence, when asked whether Kyle consented to the search of his residence, Sergeant Heatlie replied:  "He told me that we could go in and he would show us where the stuff was that he was talking about, the marijuana and copper wiring."  Defense counsel objected:  "[L]ack of foundation and *Miranda*."  The magistrate ruled the testimony admissible because Kyle had consented to a search.  Heatlie then added:  "He told me that he would go into his residence and get it, and I told him that we couldn't allow that[.]  [¶]  And he said, 'No, you could be right there.  I will point to it,' meaning that he would take me into his residence and he would point it out."  Kyle said the items (marijuana, plus additional copper wire he claimed he had found, not stolen) were "in his room."[9]

The officers went to defendant's residence, where defendant let them in and told them Kyle lived in the garage, not in the main house.[10]  A search of the garage found

---

**7**  *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

**8**  After the prosecutor admitted that neither officer had done so, the magistrate at the preliminary hearing did not allow Sergeant Heatlie to testify as to Kyle's response.

**9** Kyle's "room" was actually a space in defendant's garage demarcated by hanging blankets, but there is no evidence that Kyle explained this to the officers before they entered defendant's residence.

**10** We discuss the details of the interchange between the officers and defendant more fully below.

marijuana and additional wire.  A signal maintainer for the California Northern Railroad, called in to inspect the wire, identified it as the kind that had recently been stolen from the railroad's signals.

The magistrate (Judge Tim Buckley) ruled as to Kyle's section 1538.5 motion: The purported probation search was invalid and no good faith exception appeared to apply.  But the search of Kyle's person was valid because Kyle impliedly consented to it by turning around and putting his arms out by his side as if to say "Hey, okay, search me."  Once the search of Kyle's backpack revealed apparent burglary tools and copper wire, the officers had reasonable suspicion of a crime, warranting further investigation. Finally, Kyle was not detained for an unreasonable length of time.  Thus, although it was "a very close question," Kyle's motion to suppress was denied.

### Defendant's Section 1538.5 Motion

Defendant then brought his own motion, asserting that the evidence obtained through the warrantless search of his house and his locked bedroom must be suppressed because (1) defendant was not on parole or probation; (2) Kyle was not on searchable probation; (3) the officers illegally detained defendant in his house; and (4) the officers searched defendant's bedroom without his consent.[11]

---

[11] The prosecutor stipulated that the officers had no search or arrest warrant and that defendant was not on parole or probation.

*The Evidence in Defendant's Case*[12]

When the officers arrived at defendant's residence around 3:00 p.m., Deputy Bautista and Officer Weddell went to defendant's front door and knocked; Kyle remained in the back seat of Sergeant Heatlie's patrol car.[13] Defendant answered the door and identified himself.

At both the preliminary hearing and defendant's section 1538.5 hearing, Deputy Bautista testified that he told defendant the officers were there because Kyle had said there was contraband in the residence. Later in defendant's suppression hearing, however, Deputy Bautista said he told defendant they were there pursuant to a probation search of Kyle. It is unclear whether Deputy Bautista meant to correct or merely to amplify his prior testimony, and the magistrate (Judge Stephen Mock) made no finding on this point.

Defendant opened the door and let the officers in. He seemed "a little upset but pretty normal" and very cooperative.

Deputy Bautista asked and received permission to pat-search defendant at the entryway. Defendant turned around, emptied his front pockets, and put the contents on a table by the door. Bautista then patted him down. The deputy did not find any weapons or contraband.

---

[12] At the start of the hearing, defense counsel stipulated to make the record in Kyle's suppression hearing part of this case and stated his intent to "move forward with what few issues are pertinent just to [defendant's] suppression motion." The prosecutor stated that "the legality of the contact and search of Kyle" are "res judicata" in that another magistrate had already ruled on them; a second ruling by a magistrate on those issues would be inappropriate and might produce inconsistent rulings. Defense counsel agreed.

[13] As he walked up to defendant's front door, Deputy Bautista observed a hypodermic syringe at the edge of the driveway in a drainage ditch.

Deputy Bautista asked if anyone else was home.  Defendant said the only other person there was his five-year-old daughter.

Deputy Bautista explained that the officers intended to conduct a protective sweep of the residence.  They then did so.  They found no one but defendant's daughter, watching videos in her room; they left her there.  They also found, however, that defendant's bedroom was locked with a deadbolt.  They did not attempt to enter that room in the course of the protective sweep.  Bautista did not hear any sound from the room or detect anything to indicate someone might be inside.

Defendant directed Sergeant Heatlie and Officer Weddell to the garage, indicating that Kyle lived there.  "Once the sweep was done," they went there to conduct the search.  Deputy Bautista stayed in the family room with defendant for "officer safety purposes."

As Deputy Bautista and defendant sat at a dining table, the deputy asked defendant about his locked room—in particular, why defendant seemed upset to be asked about it.  Defendant said he "didn't like" or "didn't want" anyone going into his room, including officers doing a probation search on his brother.[14]  Bautista did not plainly testify that he asked defendant for consent to enter the room or that defendant refused consent.[15]

---

[14] The first time Deputy Bautista touched on this point, he testified that defendant said "he didn't like anyone going into his room . . . [a]nd he didn't want any of the officers coming over going through his room when they came over to check on his brother."  The second time Bautista touched on this point, he testified that defendant said  "I don't want anybody going into my bedroom."  The magistrate cited this testimony to prove defendant knew he could deny consent to the officers' entry.  However, rather than quoting defendant's actual statements (as recalled by Bautista), the magistrate relied on his own loose paraphrase thereof.  (See pp. 10-11, *post*.)

[15] Arguably, Deputy Bautista alluded to such a request in the following vague language: "I just was explaining to him that my—the reason why *I was asking him about the room and going in there* is having somebody in there and not knowing if there was anyone in there.  So I was just explaining to him that all I want to do is make sure no one was in the

8

Deputy Bautista remained in the house with defendant for 30 to 45 minutes, the time it took the other officers to complete their search of the garage. Ten or 15 minutes after their contact began, defendant and Bautista stepped onto the back patio so defendant could smoke a cigarette, then went back into the house. Later, the deputy allowed defendant to make lunch for his daughter, staying in the living room while defendant went to the kitchen.

After they returned from the patio but before defendant's daughter asked for lunch, Deputy Bautista explained that he wanted to go into defendant's bedroom only to make sure no one was inside. Then he asked defendant whether he was afraid the officers would find anything illegal in the room.[16] Defendant said he might have some Vicodin there, which he had been taking without a prescription to treat an abscess on his back. He took off his shirt to show the deputy the bandage on the abscess. The deputy noticed that defendant had track marks on his arms.[17]

Once the officers in the garage had completed their search and the copper wire they found had been identified as the railroad's property, Kyle was arrested. An officer came into the living room and asked Deputy Bautista for information to fill out the arrest paperwork.

---

room." (Italics added.) Even here, however, Bautista did not clearly state that he asked defendant's consent to go into the room.

[16] After the magistrate denied defendant's section 1538.5 motion, counsel pressed him to rule as to whether Deputy Bautista violated *Miranda* by asking defendant potentially incriminating questions without giving him advisements. The magistrate ruled that defendant's statements would be excluded in the People's case-in-chief.

[17] At the preliminary hearing, Deputy Bautista testified that he asked whether defendant used intravenous drugs; defendant denied it, then admitted it. Bautista did not repeat this testimony at defendant's section 1538.5 hearing.

Almost immediately after Kyle was arrested and transported to jail, defendant said: "Okay, do you want to go into my bedroom?" Deputy Bautista said: "Yes." Defendant pointed to his keys, which were on the table by the front door.

Defendant then became upset and said, "he couldn't believe he was doing that." He stood up, kicked the wall, and threw a can of soda across the room. He volunteered that he had a gun in the bedroom. Deputy Bautista asked him where it was; defendant said it was under the bed.

After handcuffing defendant because of his behavior, Deputy Bautista took the keys and entered the bedroom.

The magistrate denied defendant's section 1538.5 motion, giving the following reasons relevant to the issues on appeal:

1. The officers entered the residence and searched Kyle's room lawfully. The magistrate had so ruled in Kyle's section 1538.5 hearing, and that ruling was "res judicata in this hearing."

2. When Deputy Bautista sat with defendant in the living room for 30 to 45 minutes, defendant was detained.

3. Nevertheless, defendant's words and actions early in the detention showed that he knew he could refuse consent to a search of his bedroom. "Indeed, he said that under no uncertain terms to [Deputy] Bautista early on during the detention. [Bautista] talked to him about searching his bedroom to make sure that there was no one in that room that might pose a danger to the officers. And his response, as I understood it, was '*No one's going into that bedroom.*' " (Italics added.)

4. Defendant was not coerced into authorizing Deputy Bautista to go into his bedroom. He was not yet handcuffed. The conversation between defendant and the

10

deputy had been "pretty low key." "[T]here's nothing that the police do to ratchet up the stressors on the defendant to push him towards consenting to a search."

5. "So I don't find, based on all of the evidence, that this was simply a situation where [defendant] gave up and just assented to a search of his room. I find that the . . . consent was voluntary."

## DISCUSSION

In reviewing the trial court's ruling on a motion to suppress, we defer to the court's factual findings if supported by substantial evidence, but exercise our independent judgment as to whether the search or seizure was constitutionally reasonable. (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

### I. Entry Into Defendant's House

Defendant contends first that the officers' entry into his house was unlawful. Contrary to the magistrate's finding that the prior ruling on this issue in Kyle's case was "res judicata," a basis for entry might be valid as to Kyle, yet invalid as to defendant.[18] But defendant's arguments are unpersuasive.

Defendant asserts in his opening brief that the officers entered pursuant to an invalid probation search. But he ignores the alternative ground on which the magistrate in Kyle's case (and thus the magistrate in defendant's case) upheld the entry—Kyle's implied consent to the search of his person and the consequences of that consent, including his later consent to the search of his room.

---

[18] The prior ruling was not res judicata. That term applies only to a final judgment on the merits of a claim or issue. (*Dawson v. Toledano* (2003) 109 Cal.App.4th 387, 394; *Benasra v. Mitchell Silberberg & Knupp* (2002) 96 Cal.App.4th 96, 104.) A magistrate's ruling on a motion, which has not yet been reviewed by any higher court, is not a final judgment. (See 7 Witkin, Cal. Procedure (5th ed. 2008) Judgment, § 363, pp. 985-986 [interlocutory orders].)

11

"A warrantless entry may . . . be justified when voluntary consent is given. [Citations.] Such consent may be obtained from a third party who possesses common authority over the premises." (*People v. Frye* (1998) 18 Cal.4th 894, 989.)

If a third party who co-inhabits a residence has joint access or control over the premises, he has authority to consent to a search of the entire premises. (*United States v. Matlock* (1974) 415 U.S. 164, 171, fn. 7 [39 L.Ed.242, 250].) Even if the person who consents to a search lacks authority, the search is valid if the officers reasonably believe the person has such authority. (*Illinois v. Rodriguez* (1990) 497 U.S. 177, 185 [111 L.Ed.2d 148, 159].) Thus, whether or not Kyle had authority to consent to a search of the entire premises, if the officers reasonably believed he did, they could lawfully enter defendant's house based on that belief.

Although Kyle lived in the garage, not in the main house, and did not have access to defendant's locked bedroom, he did not reveal those facts to the officers before they entered defendant's house; he revealed only that he lived on defendant's premises. Thus, the officers reasonably believed Kyle had common authority over the entire premises. That belief was sufficient to justify their warrantless entry into defendant's house.[19]

In defendant's reply brief, he untimely asserts: "[A]ny valid implied consent found by the court that Kyle may have given was clearly limited to Kyle's portion of the residence." We do not consider arguments raised first in a reply brief (*Sourcecorp., Inc. v. Shill* (2012) 206 Cal.App.4th 1054, 1061-1062, fn. 7) or legal propositions asserted without authority (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979). But even if this assertion were properly before us, it would fail for the reasons given above.

---

[19] Thus we need not consider the People's unsupported assertion, contrary to the magistrate's finding in Kyle's case, that the officers' purported probation search was done in good faith, even though they did not take the elementary step of finding out whether Kyle's probation had a search condition until after they had arrested him.

## II. Entry Into Defendant's Locked Bedroom

Kyle's consent to the search of his room, and the officers' reasonable belief that he had authority to consent to a search of the premises, justified the officers' entry into defendant's house. But once the officers entered and discovered that Kyle did not have access to defendant's locked bedroom, his consent would not have justified entry into that room. The magistrate found, instead, that defendant personally and voluntarily consented to that entry. Defendant contends that he did not voluntarily consent, but merely submitted to the officers' show of lawful authority. We disagree with defendant.

"[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." (*Florida v. Royer* (1983) 460 U.S. 491, 497 [75 L.Ed.2d 229, 236].) The voluntariness of the consent is a factual question to be decided in light of the totality of the circumstances, and the trial court's express or implied findings on this issue will be upheld if supported by substantial evidence. (*People v. Miller* (1999) 69 Cal.App.4th 190, 202; *Estes v. Rowland* (1993) 14 Cal.App.4th 508, 527.) Here, we conclude that substantial evidence supports the magistrate's findings.

Some of the factors relevant to determining the voluntariness of consent are (1) whether the person was in custody at the time the consent was given; (2) whether officers had their guns drawn; (3) whether *Miranda* warnings had been given; (4) whether the person was informed of his right not to consent; and (5) whether the person was told that a search warrant could be obtained. (*People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1558 (*Ramirez*).) However, to advise defendant that he can deny permission to search is not a precondition to obtaining valid consent. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 233 [36 L.Ed.2d 854, 866]; *United States v. Watson* (1976) 423 U.S. 411, 424-425 [46 L.Ed.2d 598, 609-610]; *People v. James* (1977) 19 Cal.3d 99, 106 (*James*).)

13

And the failure to give proper *Miranda* warnings before asking consent does not vitiate an otherwise valid consent. (*James*, *supra*, 19 Cal.3d at p. 115; *Ramirez*, *supra*, 59 Cal.App.4th at p. 1560.)

The magistrate found that defendant knew he could refuse consent to a search of his room because he supposedly said, after Deputy Bautista talked about searching the room to make sure no one was in there, "No one's going into that bedroom." As indicated in our statement of facts, defendant did not actually say any such thing, and his dislike of officers going into his room did not necessarily imply that he thought he could keep them out. However, drawing all reasonable inferences in support of the judgment, as we must do under the substantial evidence standard, we conclude that the magistrate could reasonably infer defendant knew or believed he could refuse consent to a search of his room.

It is true that the magistrate impliedly found Deputy Bautista violated *Miranda* by asking questions designed to elicit incriminating admissions from defendant about what was in the bedroom (and succeeding in that purpose) without giving advisements. (See fn. 16, *ante*, p. 9.) But this fact alone cannot invalidate defendant's consent to search. (*James*, *supra*, 19 Cal.3d at p. 115; *Ramirez*, *supra*, 59 Cal.App.4th at p. 1560.)

The *Miranda* issue aside, there was no even arguably coercive conduct by the officers. They did not show force or draw their guns, and Deputy Bautista allowed defendant to move freely about the residence for 30 to 45 minutes (albeit accompanied by Bautista).

Finally, when Kyle was arrested and taken away, defendant almost immediately said, "Okay, do you want to go into my bedroom?" He then pointed to his keys. The fact that he soon regretted giving his consent to the entry does not retroactively invalidate the consent.

14

## DISPOSITION

The judgment (order denying defendant's motion to suppress evidence) is affirmed.

       BUTZ      , J.

We concur:

    BLEASE     , Acting P. J.

    MAURO    , J.