Filed 9/28/15  P. v. Menzies CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Butte)

----

| | |
|---|---|
| THE PEOPLE, | C074987 |
| Plaintiff and Respondent, | (Super. Ct. No. CM035163) |
| v. | |
| JEFFREY JAMES MENZIES, | |
| Defendant and Appellant. | |

Defendant Jeffrey James Menzies was convicted by a jury of murder, with findings of lying in wait for his victim and personally discharging a firearm in the commission of the crime.  On appeal, defendant contends the trial court erred (1) by admitting evidence obtained as a result of an unlawful detention and (2) by improperly permitting an unduly prejudicial video to be played for the jury.  He also (3) contends the lying-in-wait special circumstance instruction and finding violate Eighth Amendment

1

principles, (4) asks this court to review the trial court's ruling on his *Pitchess*[1] motion, and (5) contends the parole revocation restitution fine imposed by the trial court must be stricken. We will strike the parole revocation restitution fine as unauthorized, but otherwise will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution Evidence

In the early morning hours of September 21, 2011, David Yang drove to his job at a residential care facility. His commute took him along Highway 32, where he would turn onto Bruce Road. At about 3:21 a.m., officers found Yang dead in the driver's seat of his car, which was stopped partially in the left-hand turn lane and partially in the intersection of Highway 32 and Bruce Road. The car was still in gear, the engine was on, the turn signal was activated, and the brakes were engaged. The driver's side window was open, and the front passenger window was shattered, with glass both inside and outside the car where it was stopped and in the left-hand turn lane.

Yang had been shot in the head, with the entry point for the bullet directly over his right ear and the exit point on the left side of his skull and forehead. The bullet wound was consistent with being shot by a high-velocity rifle. Evidence indicated the shot had come from outside the car and entered through the passenger window, and that it had likely come from a raised position in the direction of the southwest corner of the intersection, where there was a raised berm.

Officers found a car parked near the intersection. In it, officers found a black rifle case containing a box of .270 Winchester-brand ammunition, some of which was missing, some expended, and some live; a .22-caliber rifle with a scope; military-issued

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

clothing with defendant's name stitched into it; a scope cover; and a camouflage-colored magazine for a rifle.  The .270 rifle was missing.

At approximately 2:30 a.m., defendant had called his friend Daniel Slack. According to Slack, defendant sounded angry and said he "needed to go shoot something."  When Slack suggested that defendant go to his family farm and shoot a can of gasoline, defendant responded that he "has an idea" and that he would get in touch with Slack later.  Slack asked what he was going to do, and defendant told him to "watch the news."  Defendant called Slack about two hours later and asked Slack to pick him up at defendant's house because he needed a ride.  When Slack arrived at defendant's house, defendant placed a bag in the back of the truck, and they drove toward the intersection, which was by then blocked off by police.  Slack asked defendant if he had anything to do with it, and defendant responded affirmatively.  Since they could not get through the intersection, they drove back to Slack's apartment.  Defendant took the bag from the back of the pickup truck and threw it in the dumpster.  They went to sleep, and after they woke up, defendant suggested they go for breakfast.  They drove past the intersection on their way to breakfast and noticed the police were still there.

In the truck, Slack asked defendant what had happened the night before, and defendant said he "shot somebody on that corner."  Initially, Slack did not believe him, in part because of defendant's calm demeanor.  After breakfast, they drove past the intersection again to see if the police were still there.  They were, so Slack and defendant went back to defendant's house.  During the drive, Slack asked what had happened, and defendant said he "sat up on a hill . . . and . . . waited for the next car to come by and . . . shot the person."  On leaving defendant's house, Slack noticed the police had left the intersection, so he returned to defendant's house and drove defendant to where defendant had left his car, but the car was no longer there.  Concluding the car had likely been towed, Slack drove defendant home and suggested defendant would have to talk to the

3

police to get his car back. Slack also suggested defendant wash his hands before going to the police station, so that any gunpowder residue would be washed away. At defendant's house, defendant drew a crude map for Slack showing where he had taken the shot and where he had left the gun. Defendant told Slack he "walked through a dry creek bed, over a fence, through a field, and [the gun] was next to a tree underneath a bush." Slack then dropped defendant at the police station, drove home, and then went to work.

Later that day, two police officers approached Slack while he was working and asked if he knew anything about defendant's activities the night before. Initially, Slack was dishonest with the officers, but when pressed Slack told officers about the telephone calls, the car rides, and defendant's statement that he had shot someone. The officers then asked Slack to participate in pretext telephone calls with defendant. (The information obtained from these calls is summarized below.)

The next day, an officer searched the dumpster at Slack's apartment complex. In it, she found "a pair of men's blue jeans, [a] pair of black socks, and a faded black dark-colored polo-type shirt." The blue jeans had several fresh tears and bloodstains on the inside, and the shirt also had some tears or large snags and a lot of "plant matter" attached to it. A later inspection on September 23, 2011, also revealed defendant had a small laceration or puncture wound on his lower left leg, a scratch on the back of his left arm, a significant scratch on the left side of his front torso, small scratches on his back, and a puncture wound with surrounding bruising on the right side of his torso.

About a week after the shooting, based on information disclosed by defendant in a pretext call, an officer searched for the rifle used in the homicide in the Dead Horse Slough area northwest of the intersection. The officer found a rifle "right after the bend in the slough" under the branch of a tree next to a barbed wire fence on the south side of the embankment for the slough. The rifle was registered to defendant.

4

During another search of the area along the barbed wire fence, an officer found blue denim-like material and black cotton knit fabric caught in the barbed wire about a hundred feet west of where defendant's car had been parked. The officer also found a black glove and a part of a label from a pair of jeans lying in the dry grass; the label appeared to match the torn label on the jeans found in the dumpster. The dark fabric removed from the barbed wire was consistent with the polo shirt found in the dumpster. Defendant could not be excluded as a contributor of the DNA culled from inside the glove, and his DNA profile matched the DNA profile pulled from the blood found inside the jeans located in the dumpster and that from the dark fabric caught in the barbed wire.

A couple of days later, a trained dog was used to search the area for shell casings. After finding nothing in the creek bed, the dog moved into the field, where his handler spotted a .270 shell casing. (The same dog and handler conducted a search on September 27, but did not find anything.) The casing had been cycled through the rifle located in the area, but was not necessarily fired from that weapon.

*Defense Evidence*

Friends, family, and a former girlfriend of defendant testified he was not a violent person and would not be capable of committing the crime charged in this matter. The girlfriend and defendant used to go shooting together, he sometimes left guns in his car, and his hobbies included stargazing.

Defendant's father testified he and defendant were at a bar together from approximately 9:30 p.m. on September 20, 2011, until 2:00 a.m. the following morning. During that time, defendant was wearing a pair of jeans and a white T-shirt that his father had delivered to him at work earlier that afternoon. The bartender from the bar testified defendant was there from about 10:30 p.m. until 1:30 or 2:00 a.m., and that he drank heavily that night.

5

Defendant also highlighted inconsistencies in Slack's interviews with police. He further presented evidence that cell phone records indicate Slack received a call at 2:14 a.m. on September 21, 2011, and that his home may not have been within the service area of the cell tower that serviced the call, but the crime scene was. Also, Slack's home was within the service area of another tower that serviced calls he received on his cell phone at 2:30 a.m. and about 4:30 a.m. Defendant's brother, who also knew Slack, testified that Slack was a dishonest person who frequently lies, and that he had been jealous of defendant.

Additionally, the passenger window remnants from Yang's car tested positive for lead, the component tested to determine if gunpowder residue is present. One would not expect to have a positive result where the gun used is a high-powered rifle unless the gun was within 15 feet of the car at the time of the shooting. However, this testing can lead to both false positives and false negatives, which could be the result of the bullet striking the glass and causing a "vaporous" lead to disburse.

Defendant presented the testimony of a forensic pathologist, who opined it appeared the bullet entered the victim's head at the back of his neck near his hairline. He also presented the testimony of a forensic scientist, who criticized some elements of the bullet trajectory analysis conducted by the Department of Justice and presented by the People. Among these is the use of a model who was four inches taller than the victim, and did not account for the position of the exit wound. Based on this expert's review, the victim had his head turned towards the left when the bullet struck him. Defendant also presented the testimony of an aerospace engineer, who noted potential sources of error in the Department of Justice's bullet trajectory analysis and the autopsy of the victim.

***Judgment and Sentencing***

The jury convicted defendant of first degree murder (Pen. Code, § 187, subd. (a)) with a special circumstance of lying in wait (*id*., § 190.2, subd. (a)(15)). It also found

6

true that defendant personally and intentionally discharged a firearm, causing great bodily injury or death. (*Id*., § 12022.53, subd. (d).) The trial court sentenced defendant to life without the possibility of parole for the first degree murder with the lying-in-wait special circumstance and to 25 years to life for the firearm enhancement. In addition to other fines, fees, and victim restitution, the trial court also ordered defendant to pay a restitution fine of $500 and a parole revocation restitution fine of $500, stayed pending successful completion of parole.

## DISCUSSION

### I. Motion to Suppress Evidence

Defendant moved to exclude his statements made to Slack during two pretext telephone calls, claiming they were obtained in violation of defendant's Fourth Amendment rights. Specifically, defendant challenges two detentions that preceded his statements to Slack in the pretext telephone calls. The trial court denied the motion, finding the two detentions were justified. On appeal, defendant asserts the trial court prejudicially erred in permitting the statements to be admitted into evidence. We conclude the trial court did not err in denying defendant's motion.

### A. *Additional Background*

The following evidence was provided at the hearing on defendant's motion to suppress evidence. On the afternoon of September 21, 2011, defendant came into the police station to inquire about his car, which had been towed from near the scene of the shooting. At the time, defendant told Detective Hoffman he had been drinking at a bar in Durham the night before, had left the bar after closing, and had driven back to Chico, where he had stopped near the intersection to observe an astrological phenomenon. Upon alighting from his car, defendant realized he was too impaired to drive, so he walked home, leaving his car behind. With defendant's consent, officers searched the car and

7

found ammunition and a .22-caliber rifle. Defendant informed them that a .270 rifle with a scope and bipod were missing.

That evening, at approximately 7:45 p.m., Detectives Stan Duitsman and Brian Miller interviewed Slack at work to ascertain what he knew about the shooting. Duitsman was previously familiar with Slack and had learned he was friends with defendant. At first Slack denied any knowledge, but on being pressed to be honest, Slack divulged that earlier that morning, defendant told Slack he was in the field adjacent to the intersection where the shooting took place with his ".270 rifle" and had shot someone. During the course of the interview (between 7:45 p.m. and 8:45 p.m.), Miller called Detective Mark Hoffman to relay this information. Duitsman then asked Slack if he would be willing to participate in a pretext telephone call with defendant. In an effort to coordinate the pretext call, Hoffman attempted to call defendant to have him come into the police station voluntarily. His call went unanswered, so Hoffman tasked other officers with surveilling defendant's home.

At about 8:00 p.m., Detectives Joel Schmid and Ben Love, who wore plain clothes and were in an unmarked truck with concealed lights, began to conduct surveillance of defendant's residence. Schmid was directed to detain defendant if it appeared he was leaving his house. He was told defendant was a suspect in a homicide based on the discovery of his vehicle, and that defendant's whereabouts were unknown but that it was believed he may have been at home. At about 9:15 p.m., an unidentified man approached the house and called for "Jeff." A man in a white T-shirt matching defendant's general physical description came outside, where the two men talked and then entered the house together. Thereafter, a pickup truck and sedan left the house in tandem. Schmid and Love began to follow the sedan, not knowing if defendant was in either vehicle. Other officers followed the truck.

8

Shortly after Detectives Schmid and Love began following the car, it pulled over to the shoulder of its own accord. Schmid turned on the concealed red and blue lights, and then approached the car wearing his police vest over his clothes. He discovered defendant was driving the car. Schmid asked defendant to get out of the car and patted him down for weapons. Schmid explained simply that he had been asked to stop defendant's car, and while they waited for other officers to arrive, they carried on a casual and benign conversation. In the course of the detention, defendant was not handcuffed, and Schmid expressly informed defendant he was not under arrest. Defendant asked if he could sit down, Schmid consented and also provided defendant with a soda.

Detective Hoffman arrived and asked defendant if he would come to the station to retrieve defendant's cell phone.[2] Defendant replied, "Is—that . . . all (unintelligible) is it all I'm doing—'cause I really, I mean, I'm, not to be rude, but like if you guys don't arrest me obviously that's . . . ." Hoffman asked why they would arrest him, and defendant responded, "I don't know. I mean, you guys are all here, you know, so . . . ." Detective Schmid reiterated that defendant was not under arrest, and defendant replied, "Oh, yeah right now. But yeah, I'll go down with you guys to get that." Hoffman and another officer drove defendant to the police station in the back seat of their unmarked police car.

At the station, defendant was invited to use the restroom in the lobby, and was informed he would be able to use the restroom and that the door to the interview room where he was being taken was unlocked. A key was required to enter the building, but none was required to exit; however, defendant was not informed of that fact. While

---

[2] At some point earlier, defendant apparently permitted law enforcement to examine his cell phone.

Detective Hoffman was activating the recording system for the interview room, defendant opened the door and stated he needed to use the restroom, so Hoffman unlocked the door leading to the restroom and allowed defendant to walk through the lobby unescorted. Another officer was stationed in a hallway next to the lobby to "keep an eye" on defendant and to prevent defendant from leaving if he tried. However, defendant was not informed of this because officers wanted him to believe he was free to leave.

Officers returned defendant's cell phone to him while he was at the police station but asked him to wait for them to complete paperwork to release the phone to him. While defendant waited at the police station, Detective Duitsman monitored two pretext telephone calls between him and Slack, who was also at the police station. During the first call, Slack asked defendant if the police knew he had shot "that dude." Defendant did not deny shooting him. Slack then asked if defendant had removed the ".270," to which defendant replied, "Negative," and suggested that Slack could remove it. Slack asked why defendant had left his car there, and defendant responded that he did not know. Slack then asked what he should do with the gun, and defendant said "Deep water." In the second call, Slack asked where exactly the gun was located, and defendant directed Slack to go northeast from the intersection, make a right, walk three houses in, walk across a dry ditch, and under an oak tree by the fence. Slack also asked why defendant had killed the victim, and defendant initially said they would talk about it later and then responded "I don't know," and that he was drunk. After the calls were conducted, Detective Hoffman asked defendant if he had told anyone that he had shot someone. Defendant then asked to speak to an attorney, and Hoffman ended the interview and placed defendant under arrest.

Defendant also testified at the motion to suppress hearing. It appeared to him that the officer who approached the car during the traffic stop had his weapon drawn. He was instructed to stop the car and put his hands up. He further described the patdown as

"aggressive," and stated that "[i]t was clear to [him] that [he] wasn't able to . . . leave," even if he was not arrested or handcuffed. Defendant acknowledged he voluntarily agreed to go to the police station because he was being cooperative.

The trial court found the initial detention, i.e., the traffic stop, was justified by Slack's statements to the police and the fact the cars came directly from defendant's house. The trial court found the further detention, i.e., at the police station, was justified by the information provided by Slack. Defendant contested the trial court's finding that the cars came directly from defendant's house, and argued the evidence demonstrated "two people walked out of view, they walk out of the house and out of view of the officers, and then two cars went by." Nonetheless, the trial court denied defendant's motion to exclude the statements defendant made to Slack during the pretext telephone calls.

## B. *Initial Detention*

Defendant first asserts Detectives Schmid and Love lacked reasonable suspicion to justify the initial detention of defendant because they did not know he was engaged in criminal conduct or that defendant was in the car they followed. We conclude no Fourth Amendment violation occurred during the initial detention to warrant suppression of defendant's statements to Slack during the pretext telephone calls.

In reviewing a trial court's ruling on a motion to suppress, "[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362; see *People v. Weaver* (2001) 26 Cal.4th 876, 924.) In reviewing the reasonableness of a detention, we "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and

11

objective basis' for suspecting legal wrongdoing." (*United States v. Arvizu* (2002) 534 U.S. 266, 273 [151 L.Ed.2d 740, 749].)

That Detectives Schmid and Love were not privy to the information obtained by the homicide investigators does not limit our inquiry into the justification for the stop. Instead, "[u]nder the collective knowledge doctrine, we must determine whether an investigatory stop, search, or arrest complied with the Fourth Amendment by 'look[ing] to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually [undertakes the challenged action].' " (*United States v. Ramirez* (9th Cir. 2007) 473 F.3d 1026, 1032.) "[W]hen police officers work together to build 'collective knowledge' of probable cause, the important question is not what each officer knew about probable cause, but how valid and reasonable the probable cause was that developed in the officers' collective knowledge." (*People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1555.)

Here, Detective Hoffman had learned the victim had been shot in the early morning hours of September 21, 2011. He knew defendant's car was left abandoned near the intersection where the victim was shot. He knew defendant had multiple rifles and ammunition in his car. And he knew defendant had told Slack that he had used his .270 rifle to shoot at a man at the intersection that morning. Sergeant Daniel Fonseca, who was supervising the homicide investigation, learned from his detectives that a witness indicated defendant admitted shooting someone at the intersection that morning, and he had found the car registered in defendant's name near the intersection. Based on this information, Fonseca had reasonable suspicion defendant was involved in legal wrongdoing to support his directive to Detective Schmid to detain defendant, and Schmid, based on the collective knowledge doctrine, had reasonable suspicion to detain defendant.

12

Thus, we must address whether Detective Schmid had a reasonable suspicion to detain the driver of the car leaving defendant's house, when he did not know whether the driver was defendant. Here, Schmid had reason to believe defendant was at home. He had been informed defendant was likely at home, and when an unidentified man approached the house and called defendant's first name, a man matching defendant's general physical description walked out of the house, spoke to the unidentified man, and they both entered defendant's home together. Thus, when two vehicles thereafter left the house together "in tandem," Schmid had reasonable suspicion to believe defendant was in either one of the vehicles. And, particularly, Schmid had reason to suspect defendant was in the sedan Schmid followed because he had seen that car at the house earlier that evening. Therefore, it was appropriate for officers to detain the drivers of both vehicles in an effort to detain defendant, and the initial detention did not violate the Fourth Amendment.

### C. *Consent to Continued Detention*

We also reject defendant's contention that his continued detention on the side of the road, in the police car driving to the police station, and at the police station violated his Fourth Amendment rights because his consent was not voluntary and was fraudulently obtained. Whether consent is voluntary or coerced is a question of fact to be determined from the totality of the circumstances. (See *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 227 [36 L.Ed.2d 854, 863]; *People v. Jenkins* (2000) 22 Cal.4th 900, 973.)

First, we note that to the extent this contention is premised on some assertion of taint derived from the allegedly illegal initial detention, we have already concluded the initial detention was properly supported by reasonable suspicion. Therefore, such a contention is unavailing.

Defendant argues his consent is invalid because he was lured to the police station under false pretenses because the police never intended to allow him to leave once they

13

gave him his cell phone. While an officer's use of deceptive practices to obtain consent is one relevant factor to be considered in determining whether consent is voluntarily given, "no single factor is dispositive of this factually intensive inquiry." (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1578.)

Officers did in fact want to provide defendant with his cell phone, for without it he would not be able to participate in the pretext telephone calls with Slack. Therefore, the officers' deception was only partial. Moreover, during this period, defendant was not physically restrained, arrested, or threatened in any manner, and nor has defendant asserted the detention was unduly prolonged, or that he was submitted to intimidating tactics. Indeed, while waiting for Detective Hoffman, defendant and the officers engaged in lighthearted small talk while defendant sat on the curb and drank an orange soda. And once he was taken to the police station, defendant was permitted to walk unaccompanied across the lobby to use the unlocked restroom and to return to the unlocked interview room where he waited alone.

Thus, this case is not like *People v. Reeves* (1964) 61 Cal.2d 268, 273, where police caused a hotel manager to call Reeves and falsely tell him he had a package so that they could peek inside his room when he opened the door because they lacked probable cause to search his room, or *People v. Reyes* (2000) 83 Cal.App.4th 7, 9, 12-13, where police lured the defendant to open his apartment door so they could gain access by concealing their identity, knocking on the door, asking if he owned a white truck parked outside, indicating they had struck it, and then, once in an alley, surrounding him in tactical gear and asking accusatory questions. Here, police did not induce defendant to surrender his privacy rights, hide the fact law enforcement was involved, or lure him into an intimidating situation. And, there was no evidence the police asked him any incriminating questions until *after* the pretext calls were completed.

14

Second, defendant asserts officers refused his request to leave. He does not specifically indicate when such a request was made, and the record belies that any such request was made. Following the initial detention, Detective Hoffman arrived and asked defendant to accompany him to the police station to collect his cell phone. It is true defendant was initially hesitant, but he then agreed to come to the police station, noting that he had been advised he was not under arrest. He did not, during this interaction, ask to leave. Rather, defendant testified he agreed to accompany police to the station to be cooperative. It appears defendant may be arguing detectives refused to let him leave the police station once he had his cell phone. Hoffman did testify at the motion to suppress hearing that he led defendant to believe he would be free to leave once he got his cell phone, and upon giving him his cell phone told him he had to wait for release paperwork before he could leave. However, there is nothing in the record to indicate defendant asked to leave and was refused at this time either. Therefore, we fail to discern any refusal by officers of a request made by defendant to leave.

Therefore, the initial detention was supported by reasonable suspicion that defendant had committed murder, and the continued detention was warranted by defendant's consent, which was voluntarily given. Accordingly, the trial court did not err in denying defendant's motion to suppress evidence of the statements he made to Slack during the two pretext telephone calls.

## II. Improper Impeachment

Defendant contends the trial court prejudicially erred when it permitted the People to present to the jury as impeachment evidence a video of defendant shooting handguns while wearing a collared red and blue shirt. Even if defendant had not forfeited this contention by failing to object to the admission of the evidence in the trial court, he would not prevail. For it was not an abuse of discretion for the trial court to admit the evidence for impeachment purposes.

15

During defendant's case-in-chief, he presented testimony from his girlfriend that he wore a size large shirt, that he always wore casual clothes, i.e., T-shirts and shorts, and that he did not wear polo shirts or collared shirts, but she did recall that he had worn a collared cowboy-style shirt on a date once.[3]  His father also testified that he had seen defendant in a polo shirt before, but not a black one.  However, they both recalled that Slack frequently wore darker colored clothing, including black polo shirts.

The People proposed to play two short video clips in which defendant is wearing a collared shirt.  In one video, defendant is shooting handguns in a rural setting, and, in the other, defendant is shooting what appears to be the rifle at issue in this matter.  Defendant argued, pursuant to Evidence Code section 352,[4] that showing one of the videos might be appropriate, but not both, and that the video of defendant shooting the rifle is unduly prejudicial and offers no more probative value than the video of defendant shooting handguns.  The trial court permitted the video of defendant shooting handguns to be admitted for the purposes of rebutting information regarding whether defendant wore collared shirts.  It also provided a limiting instruction that the jury could "consider that video only for the purpose of showing the defendant wearing certain clothing."

Evidence is not rendered inadmissible by section 352 "unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights."  (*People v. Holford* (2012) 203 Cal.App.4th 155, 167.)  The court's exercise of discretion under section 352 will not be reversed on appeal absent clear and manifest abuse.  (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457.)  Thus, to justify appellate intrusion, the trial court must have exercised its

---

[3]  The reporter's transcript references shirts with or having "a color," but it appears this is an error and instead refers to a collar.

[4]  Undesignated statutory references are to the Evidence Code.

discretion "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

There was evidence presented that the shooter had worn a black polo shirt at the time of the shooting, and defendant presented evidence that he did not wear collared shirts or polo shirts. The video showed defendant wearing a polo shirt. Therefore, contrary to defendant's assertion on appeal, the video does rebut the witnesses' testimony that he does not wear polo-type or collared shirts, and thereby serves to undermine the girlfriend's and father's credibility as defense character witnesses.

The only possible prejudice we can conceive that would result from viewing the video would be for the jury to discover that defendant enjoys shooting guns. However, it was never disputed that defendant enjoyed shooting guns, or that he owned guns. Indeed, his own girlfriend testified that they liked to shoot together, and defendant informed police himself that his .270 rifle was allegedly missing from his car following the murder. That he smiles and laughs lightheartedly with an off-screen companion at the end of the seven-second video clip does not indicate he "is predisposed to engage in dangerous or lethal gunplay for amusement without due regard for potentially serious consequences."

Therefore, the probative value of the evidence to directly rebut evidence that defendant would not have worn the black polo shirt found in the dumpster and to indirectly undermine defendant's character witnesses, was not "substantially outweighed" by the risk of undue prejudice. Accordingly, we find no abuse of discretion in the trial court's decision to admit the evidence.

Defendant's derivative due process assertion likewise fails. (See *People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1104 [due process assertion necessarily depends on whether the trial court sufficiently and properly evaluated the proffered evidence under § 352].) Here, we have concluded the impeachment evidence was properly admitted under section 352, and defendant has not shown that the circumstances

17

present were so extraordinary or unusual that admission of the evidence violated his constitutional right to due process of law.

### III. Lying-in-wait Special Circumstance

Defendant contends the lying-in-wait special circumstance as interpreted by the California Supreme Court and as articulated in the jury instruction employed in the instant case violates the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution because it does not meaningfully distinguish between those who commit first degree murder with and without the special circumstance. The trial court gave the standard lying-in-wait special circumstance instruction, as set forth in CALJIC No. 728, which, as given to the jury, stated in relevant part: "To prove that [the lying-in-wait] special circumstance is true, the People must prove that, one, the defendant intentionally killed David Yang. And, two, the defendant committed the murder by means of lying in wait. [¶] A person commits a murder by means of lying in wait if, one, he or she concealed his or her purpose from the person killed. Two, he or she waited and watched for an opportunity to act. Three, then he or she made a surprise attack on the person killed from a position of advantage. And, four, he or she intended to kill the person by taking the person by surprise."

Defendant concedes the California Supreme Court has repeatedly rejected similar challenges on the merits (see, e.g., *People v. Mendoza* (2011) 52 Cal.4th 1056, 1095; *People v. Carasi* (2008) 44 Cal.4th 1263, 1310; *People v. Cruz* (2008) 44 Cal.4th 636, 678; *People v. Lewis* (2008) 43 Cal.4th 415, 515-516; *People v. Stevens* (2007) 41 Cal.4th 182, 203; *People v. Jurado* (2006) 38 Cal.4th 72, 145-147 (conc. opn. of Kennard, J.); *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1149; *People v. Sims* (1993) 5 Cal.4th 405, 434), but nonetheless raises the contention to preserve it for further review. In light of existing precedent, and assuming defendant did not forfeit this contention by

18

failing to raise it in the trial court, we reject defendant's contention. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## IV.  Review of *Pitchess* Proceedings

Defendant requests this court to independently review the sealed transcript of the *Pitchess* hearing to determine if the trial court properly denied his *Pitchess* motion, contending such review is proper where, as here, the motion sought information related to the legality of a search. (*People v. Hobbs* (1994) 7 Cal.4th 948, 955-957.)  The People do not oppose the request.

In the trial court, defendant filed a *Pitchess* motion seeking discovery of the law enforcement personnel records of Officers Fonseca, Schmid, Hoffman, and Carlos Jauregui relating to claims of official misconduct and any other material that would be exculpatory or impeach the officers' credibility.  The trial court conducted an in camera examination of the records provided.  Following that examination, the trial court ordered disclosure of some information and incidents, and did not order disclosure of other information.

We will not disturb a trial court's ruling on a *Pitchess* motion absent an abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)  Having reviewed the *Pitchess* record, we find no procedural or substantive error in the trial court's handling of the motion or in its ruling. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1208-1209.)

## V.  Parole Revocation Restitution Fine

Defendant contends, and the People agree, that the $500 parole revocation restitution fine imposed by the trial court must be stricken.  The trial court must impose a parole revocation restitution fine in the same amount as the restitution fine imposed pursuant to Penal Code section 1202.4, subdivision (b) "[i]n every case where a person is

19

convicted of a crime and his or her sentence includes a period of parole," postrelease community supervision, or mandatory supervision. (Pen. Code, § 1202.45, subds. (a)-(b).) Here, however, defendant's sentence of life without the possibility of parole does not include a period of parole, postrelease community supervision, or mandatory supervision. Therefore, the $500 parole revocation restitution fine imposed by the trial court is unauthorized and must be stricken. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1184-1186.)

## DISPOSITION

We strike the parole revocation restitution fine imposed by the trial court. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy of the same to the Department of Corrections and Rehabilitation.


                                                    _____BUTZ_____, J.


We concur:


_____ROBIE_____, Acting P. J.


_____HOCH_____, J.

20