[No. B102146. Second Dist., Div. Seven. Nov. 18, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERTO RAMIREZ, Defendant and Appellant.

## COUNSEL

John Yzurdiaga for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Susan D. Martynec and James William Bilderback II, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, Acting P. J.**—Roberto Ramirez appeals from the judgment entered upon his plea of guilty to conspiracy to possess cocaine (Pen. Code, § 182). He contends the evidence of cocaine the police found in the trunk of his car should have been suppressed on grounds (1) the police illegally detained his vehicle without probable cause, and (2) he did not give a voluntary consent to the search of his car. We find both of appellant's arguments unpersuasive and therefore affirm.

### STATEMENT OF FACTS AND PROCEEDINGS BELOW

Evidence relating to the search and seizure of appellant's vehicle was taken at the hearing on a motion to suppress on March 13, 1996. The evidence established Drug Enforcement Administration Special Agent Dave Marzullo was conducting a wiretap operation pursuant to a federal court order on November 3, 1995. During this operation, Agent Marzullo intercepted a call which indicated 300 kilograms of cocaine were to be delivered to 2641 Jackson Street, a residence in Carson, Los Angeles County. Orange County Sheriff's Investigator Thomas Dove received information from agent Marzullo that 300 kilograms of cocaine were to be delivered to the 2641 Jackson address. Investigator Dove then related this information to Narcotics Officer Scott Dean McKnight, who was parked on the west side of the 2600 block of Jackson Street for 24-hour surveillance of the location.

Shortly after 10:20 on the morning of November 5, Officer McKnight observed appellant arrive at the 2641 Jackson residence in a blue Ford Tempo. Appellant drove his car into the driveway and behind the house until he disappeared from Officer McKnight's view.

Appellant stayed inside the house for 40 to 50 minutes, after which he drove away in the same car. Believing appellant possibly picked up a supply of cocaine from the Jackson residence, Officer McKnight began to follow

appellant's car at a distance of 50 to 75 yards. Although Officer McKnight did not look at his speedometer or clock the speed of appellant's vehicle, he estimated appellant's vehicle was traveling at a speed of 40 to 45 m.p.h. in a residential area with a posted speed limit of 25 m.p.h.

Officer McKnight advised over his police radio to other surveillance team members—Investigator Dove, Investigator Rodolpho Garcia, and Sergeant John Ortega—he believed appellant's vehicle was speeding. He also related to Investigator Dove he thought appellant was "hauling ass." Investigator Dove had previously arranged with his sergeant to have a marked patrol unit in the area in the event any cars needed to be stopped. Upon learning appellant was getting away at a high speed from the Jackson residence, Investigator Dove relayed this information to Sergeant Ortega. When Sergeant Ortega saw appellant's vehicle turn northbound on Dominguez, he directed Los Angeles Sheriff's Sergeant Brown to make a stop of appellant's vehicle in order to conduct a narcotics investigation.

After making the stop of appellant's vehicle, Sergeant Ortega stepped up to the vehicle and asked appellant in Spanish if he would be "so kind and be cooperative and allow us to search the vehicle." Appellant responded by saying "yes" in Spanish and handed his car keys to Sergeant Ortega. Sergeant Ortega also instructed appellant to step out of his vehicle, and appellant stepped out to the sidewalk. As appellant was standing on the sidewalk, Investigator Garcia talked with appellant while preparing a search consent form appellant could sign. When Sergeant Ortega opened the trunk of appellant's vehicle, he found 50 kilograms of cocaine wrapped in plastic bags. When appellant saw the cocaine in his trunk, he immediately asked for an attorney and refused to sign the consent form Investigator Garcia had prepared.

The trial court ruled the bare possibility appellant's vehicle contained narcotics did not constitute sufficient probable cause to stop appellant's vehicle. The court upheld the search, however, after finding the traffic violation constituted sufficient probable cause for stopping appellant's vehicle and once stopped, appellant consented to the search of his trunk.

Discussion

I. *Officer Brown's Stop of Appellant's Vehicle Was Justified in That He Relied on the Collective Knowledge of Other Officers to Establish Probable Cause.*

 When officers lack either a search or arrest warrant, they may stop a person's vehicle only when they have sufficient probable cause to believe

the person being detained has committed a crime. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Terry* v. *Ohio* (1968) 392 U.S. 1, 21-22 [88 S.Ct. 1868, 1880, 20 L.Ed.2d 889].)

Appellant here does not argue Officer McKnight, upon seeing appellant drive his car from the Jackson Street residence, lacked sufficient probable cause to believe appellant committed a traffic violation. Officer McKnight testified Jackson Street was a residential street with a posted speed limit of 25 m.p.h. Furthermore, he testified that based on his 9 years of experience as a police officer who issued traffic citations, he estimated appellant's vehicle was traveling at approximately 40 to 45 m.p.h. As these were the "specific and articulable facts" the officer personally witnessed and from which he could derive "rational inferences" appellant was breaking a traffic law, Officer McKnight clearly had sufficient probable cause to stop appellant's vehicle.

Appellant, however, argues that although Officer McKnight possessed sufficient probable cause to detain appellant's vehicle based on a traffic violation, Officer Brown, who actually made a stop of the appellant's vehicle, did not have knowledge of Officer McKnight's probable cause. Appellant further argues there is no evidence the knowledge of appellant's traffic violation reached either Investigator Dove or Sergeant Ortega because the term "hauling ass" Officer McKnight used to describe appellant's vehicle speed does not in itself indicate appellant was breaking a speed limit.

It is well settled in California officers can make arrests based on information and probable cause furnished by other officers. (*Remers* v. *Superior Court* (1970) 2 Cal.3d 659, 666 [87 Cal.Rptr. 202, 470 P.2d 11]; *People* v. *Madden* (1970) 2 Cal.3d 1017, 1021 [88 Cal.Rptr. 171, 471 P.2d 971]; *People* v. *Lara* (1967) 67 Cal.2d 365, 374 [62 Cal.Rptr. 586, 432 P.2d 202]; *People* v. *Alcorn* (1993) 15 Cal.App.4th 652, 655 [19 Cal.Rptr.2d 47]; *People* v. *Poehner* (1971) 16 Cal.App.3d 481, 486-487 [94 Cal.Rptr. 94]; *People* v. *Adkins* (1969) 273 Cal.App.2d 196, 198 [78 Cal.Rptr. 397].) These cases, however, require that when the first officer passes off information through "official channels" that leads to arrest, the officer must also show basis for his probable cause. In other words, the so-called "Harvey-Madden" rule requires the basis for the first officer's probable cause must be "something other than the imagination of an officer who does not become a witness." (*Adkins, supra,* at p. 198.)

In *Remers* v. *Superior Court, supra,* 2 Cal.3d 659, the arresting officer arrested and searched the defendant's purse when he heard from other

officers the defendant had been selling dangerous drugs before. The officer, however, did not know whether the basis of the information given him by other officers came from an informer or some other officer who actually observed the defendant make a sale of drugs. The court ruled the arresting officer lacked probable cause to search the defendant's purse because the prosecution failed to show the basis for the former officer's information. To explain its ruling, the court stated "the absence of such a requirement would allow a police officer to manufacture reasonable grounds to arrest while circumventing the necessity of pointing to 'specific and articulable facts' [citation] justifying his suspicions." (At p. 667, quoting from *Terry* v. *Ohio, supra,* 392 U.S. 1, 21 [88 S.Ct. 1868, 1880].)

On the other hand, in *People* v. *Poehner, supra,* 16 Cal.App.3d 481, the border patrolmen seized a package of drugs thrown from the defendant's vehicle after the patrolmen learned from a fellow officer a blue Volkswagen which was owned by San Diego resident and which had a specified license number was crossing the border from Tijuana, but the suspect vehicle escaped from his view. The fellow officer suspected the defendants may have picked up narcotics from Tijuana because there was no reason why they would take a 70-mile detour route to enter San Diego through the Tecate border station.

The court ruled the border patrolmen had sufficient probable cause to stop and seize the package of drugs from the defendants because proof of probable cause the patrolmen received from the fellow officer was " 'factual rather than conclusionary,' related 'specific and articulable facts,' was the product of personal observations by the informing officer, and was reliable." (*People* v. *Poehner, supra,* 16 Cal.App.3d 481, 488, quoting from *People* v. *Hamilton* (1969) 71 Cal.2d 176, 179-180 [77 Cal.Rptr. 785, 454 P.2d 681].) The court held the test requiring the prosecution to show the basis of the information furnished through official channels is not whether the facts related through the channels are correct, but whether reliance on such information by the arresting officer was reasonable. "The sufficiency of the showing on this issue is dependent upon the sufficiency of the evidence to justify the conclusion reliance on such information was reasonable, and not upon the sufficiency of the evidence to justify the conclusion the transmitting officer's observations were correct." (*Poehner, supra,* at p. 489.)

■ Likewise, Officer McKnight formed his probable cause to stop appellant from what he observed. He saw appellant drive out of the Jackson Street residence, and he saw appellant speeding down the residential street with a speed limit of 25 m.p.h. From his experience as a police officer, he estimated appellant's speed to be 40 to 45 m.p.h. His suspicion appellant

was breaking a speed limit was borne out of personal observation of "specific and articulable facts." From Officer McKnight's long experience as a police officer, it was also reasonable for other officers to rely on his information about appellant's vehicle speed. In other words, Officer McKnight had a very strong basis for his probable cause because he himself witnessed appellant's driving behavior, and his inference appellant was breaking a speed limit was reasonable from his experience as a police officer.

Also, appellant's contention the arresting officer must know the precise basis of his fellow officer's conclusion probable cause existed at the time of arrest does not find any support from California authorities. Although there is no case in California directly on point, it is not difficult to infer from these authorities when police officers work together to build "collective knowledge" of probable cause, the important question is not what each officer knew about probable cause, but how valid and reasonable the probable cause was that developed in the officers' collective knowledge.

In all the cases we have researched in which arrests were made based on the collective knowledge of police officers, no probable cause was held insufficient because the officer who ultimately executed the arrests did not have specific knowledge of the nature and extent of his fellow officers' conclusion probable cause was present.

In *People v. Poehner, supra*, 16 Cal.App.3d 481, the border patrolmen who ultimately conducted the search and seizure were informed by another officer of the suspect vehicle's color, model, its license plate number, and the fact it turned onto a side road with its lights turned off. Although it is part of a patrolman's duty to conduct narcotics investigation, it is certainly not his or her only duty. Even though the arresting patrolmen most likely believed they needed to investigate the suspect vehicle for narcotics violations, the relaying officer did not need to specify his probable cause to the arresting officers to make their search and seizure valid, so long as the first officer could show the basis for his probable cause.

In *People v. Ngaue* (1992) 8 Cal.App.4th 896 [10 Cal.Rptr.2d 521], one police officer relayed a radio call to another police officer to retrieve a gun in defendant's bathroom. The first officer heard the gun fall to the bathroom floor, and another fellow officer told him he saw the gun on the bathroom's floor. Although the officer who actually retrieved the gun neither heard nor saw the gun in the bathroom, the court upheld that officer's warrantless search and seizure. In other words, the retrieving officer had no knowledge of any probable cause but was simply ordered to retrieve the gun by another

officer. The retrieving officer could very well have conjectured the reason he must retrieve the gun was to protect other police officers. However, the probable cause behind the order to seize the gun was never directly communicated to the officer. The court did not consider this deficiency to be an obstacle when it validated the seizure of the gun because the other officers' knowledge of probable cause that went into forming the officers' collective knowledge was sufficient to make the seizure reasonable.

Policy considerations also strongly suggest officers and investigators need not inform the final arresting officer of the precise nature of the probable cause they possess. The requirement that an officer furnishing probable cause which other officers use to justify an arrest or search show the basis for his information *in court* arose out of concern that without such requirement, officers might resort to manufacturing their own probable cause. Without this requirement, "every utterance of a police officer would instantly and automatically acquire the dignity of official information; 'reasonable cause' or 'reasonable grounds' . . . could be conveniently fashioned out of a two-step communication; and all Fourth Amendment safeguards would dissolve as a consequence." (*People* v. *Pease* (1966) 242 Cal.App.2d 442, 449 [51 Cal.Rptr. 448].)

Officer McKnight, however, did not manufacture his probable cause. He did not receive information appellant was speeding from a private informant or another officer. He directly observed appellant leave the house and saw him driving away at an estimated speed of 40 to 45 m.p.h. There is no evidence in his testimony he needed to make up or manufacture appellant's traffic violation as a reason for stopping appellant to conduct a narcotics investigation. In sum, Officer McKnight does not pose a threat to Fourth Amendment safeguards that other cases have referred to. Appellant obviously would not have gained any more constitutional protection by requiring Officer McKnight inform Officer Brown about the nature of appellant's traffic violation and his observations than by allowing him to simply order Officer Brown to detain appellant's vehicle. In either event, the officer must possess and the People must prove he had probable cause to stop appellant's vehicle.

Other policy considerations behind the Fourth Amendment also tip the scale in favor of finding Officer Brown's search and seizure valid in our case. In *People* v. *Alcorn, supra,* 15 Cal.App.4th 652, the court addressed the issue of whether the officer who produced the abstract of an arrest warrant rather than the actual warrant to establish probable cause for arrest has met his burden of proof for showing the basis for his probable cause. Prior to *Alcorn* and *People* v. *Armstrong* (1991) 232 Cal.App.3d 228 [283 Cal.Rptr.

429], the California courts adhered to what was then known as the *Romanoski* (*People* v. *Romanoski* (1984) 157 Cal.App.3d 353 [204 Cal.Rptr. 33]) rule: An officer establishing probable cause for an arrest warrant was required to produce either the actual warrant or a certified copy of the actual warrant. A mere abstract of the warrant did not suffice. In overturning the *Romanoski* rule, the court in *Armstrong* declared the rigid requirement of presenting the actual warrant or its certified copy to establish probable cause was not always necessary, and the proof that the warrant information precipitating the arrest was not manufactured "may be made by circumstantial evidence other than the warrant or a certified copy." (*Armstrong, supra,* at p. 245.) Following *Armstrong*'s lead, the court in *Alcorn* validated the officer's probable cause based on an abstract of warrant. The court reasoned when asking how much "quantum of proof" officers must show to justify their probable cause, the court must carefully balance the protection of individual privacy under the Fourth Amendment and the cost the exclusionary rule extracts from society. "Requiring the prosecution to produce the actual warrant, or a certified copy, on pain of having evidence suppressed extracts a high cost from society, with no corresponding benefit. The cost seems especially high when there has been no showing that even suggests the warrant is anything less than what the abstract purports." (*Alcorn, supra,* at p. 659, italics omitted.)

In the same vein, Officer Brown also relied on the collective knowledge of probable cause relayed through official communications to establish his probable cause. The exact nature of probable cause may not have been clear to Officer Brown. However, before requiring Officer Brown to show proof he was aware of the exact nature and extent of probable cause to stop appellant, we must also balance appellant's Fourth Amendment safeguards and the cost they extract from enforcing laws in our society. It is clear appellant was the very suspect the law enforcement officers wanted to stop in order to properly and aggressively conduct a narcotics investigation, although the reasons for stopping him may have been unrelated to his traffic violation.[1] On the other hand, appellant gains no more constitutional safeguards by requiring Officer Brown to demonstrate a higher level of knowledge than what he had already shown—the person he stopped was none other than the person whom Officer McKnight had legitimate and reasonable

[1] Appellant in our case does not raise the issue of whether the stop of his vehicle for speeding was a mere pretext for conducting a narcotics investigation. The legality of pretextual stop was settled by the United States Supreme Court in *Whren* v. *United States* (1996) 517 U.S. 806 [116 S.Ct. 1769, 135 L.Ed.2d 89], in which the court ruled that if a traffic law was violated by the vehicle being stopped, the police officer's subjective motivation for making the stop is irrelevant. Thus, the stop of appellant's vehicle would be valid in our case, even if the arresting officer's only reason for stopping appellant had been to investigate narcotics violations.

probable cause to stop and investigate in the first place. In sum, the heightened proof and showing of probable cause by Officer Brown appellant demands does not add any more safeguards to appellant than what are already afforded him through our previous cases and unreasonably hinder officers from discharging their duties to conduct narcotics investigations. As such, we conclude that Officer Brown possessed sufficient probable cause to detain appellant.

## II. *Appellant's Consent to Officer's Search of His Car Was Voluntary.*

 Appellant also argues his consent to the search of his vehicle was not voluntary under the circumstances of his case. He advances two main arguments: (1) Sergeant Ortega's question of whether appellant "would be so kind and cooperative and allow us to search the vehicle" is not only hardly believable, but it also fails to specifically elicit appellant's consent; (2) appellant's consent was not voluntary under the five-factor test of *U.S.* v. *Carbajal* (9th Cir. 1992) 956 F.2d 924. The *Carbajal* test[2] considers, among other factors, "(1) whether the person was in custody; (2) whether the arresting officers have their guns drawn; (3) whether Miranda warnings have been given; (4) whether the person was told she has a right not to consent; and (5) whether the person was told a search warrant could be obtained." (*Carbajal, supra,* at p. 930 fn. 3.) Appellant contends that since he was in custody, was given no *Miranda* warnings, and was not informed of his right to refuse, his consent could not be voluntary. Furthermore, he contends his refusal to sign a consent form given by Officer Garcia shows his consent was not voluntary.

 At the outset, we observe we are a reviewing court. Since the trial court accepted Sergeant Ortega's version of what he asked appellant and what appellant responded in return, we must accept it as well. Moreover, we must also accept the trial court's finding appellant's consent was voluntary unless there is substantial evidence to the contrary. "Where substantial evidence supports a preliminary finding by the trial court and the implied ultimate finding by the jury that a voluntary consent has been given, a reviewing court must accept consent freely given as a fact proven." (*People* v. *Roberts* (1966) 246 Cal.App.2d 715, 727 [55 Cal.Rptr. 62]; *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 762-763 [44 Cal.Rptr. 313, 401 P.2d 921]; *People* v. *Jackson* (1961) 191 Cal.App.2d 296, 300 [12 Cal.Rptr. 748].) "The question of the voluntariness of the consent is to be determined in the first instance by the trier of fact; and in that stage of the process, 'The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence

[2]The court in *Carbajal* borrowed the test from *U.S.* v. *Castillo* (9th Cir. 1988) 866 F.2d 1071, 1082.

and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence.'" (*People* v. *James* (1977) 19 Cal.3d 99, 107 [137 Cal.Rptr. 447, 561 P.2d 1135] quoting from *People* v. *Superior Court* (*Keithley*) (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].)

The testimony is undisputed and unequivocal Sergeant Ortega asked appellant for permission to search his vehicle, and appellant answered "yes" in Spanish and handed his car keys over to Sergeant Ortega. We see no other way to interpret appellant's word and gesture than as an expression of his consent to a search of his vehicle. The trial court apparently also accepted this interpretation and ruled appellant's consent was voluntary. Since no substantial evidence to the contrary exists, we must accept the trial court's finding as such, and our powers as a reviewing court end there. However, even assuming our court were to take on the role of evaluating the voluntariness of appellant's consent based on the *Carbajal* test as appellant insists, we find appellant's consent was voluntary.

First, at the time Sergeant Ortega asked appellant for his permission to search the vehicle, appellant was not in custody but was merely being detained by the officers for simple questioning on a traffic violation. However, even assuming appellant was held in custody, custody in itself has never been held sufficient to demonstrate appellant's consent was not voluntary. (*United States* v. *Watson* (1976) 423 U.S. 411, 424-425 [96 S.Ct. 820, 828, 46 L.Ed.2d 598].) Even an appellant's arrest at the time of consent has not been held sufficient to prove that his consent was involuntary. (*People* v. *Robinson* (1957) 149 Cal.App.2d 282, 287 [308 P.2d 461].)

Second, the courts consistently hold that neither the lack of *Miranda* warnings nor the failure of police officers to inform appellant of his right to refuse can invalidate an otherwise facially voluntary consent by appellant. In *People* v. *Roberts, supra,* 246 Cal.App.2d 715, the court held that informing an accused of his constitutional right to refuse permission to a search and seizure has never been indispensable to a valid search and seizure, stating "the very request for permission to enter and search imports advice that a negative response is within the defendant's rights." (*Roberts, supra,* at p. 729.) "The mere asking of permission to enter and make a search carries with it the implication that the person can withhold permission for such an entry or search." (*People* v. *Chaddock* (1967) 249 Cal.App.2d 483, 485-486 [57 Cal.Rptr. 582].) Likewise, the failure to give proper *Miranda* warnings before asking for permission to search also has been held not to invalidate an otherwise valid consent. (*People* v. *James, supra,* 19 Cal.3d 99, 115.

Furthermore, the evidence does not support a claim the officers asserted authority that may have coerced appellant into giving consent or made the consent less than voluntary. The officers did not draw their guns on appellant. Nor did they make a statement a warrant could be obtained if appellant refused consent. Under these circumstances, we concur in the trial court's finding appellant's consent to the search of his vehicle was voluntary.

DISPOSITION

The judgment is affirmed.

Woods, J., and Neal, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 11, 1998.