Filed 12/15/22  P. v. Wherry CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. GREGORY WHERRY, Defendant and Appellant. | B299585 (Los Angeles County Super. Ct. No. SA095200) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lauren Weis Birnstein, Judge.  Affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney, and Gary A. Lieberman, Deputy Attorney General, for Plaintiff and Respondent.

Shortly after being arrested for the murder of Marvin Ponce (Ponce), Gregory Wherry (defendant) was placed in a holding cell with a police informant. Defendant made a number of incriminating statements, and a recording of the jail cell conversation was played for the jury at defendant's criminal trial. We are asked to decide whether the jailhouse recording should have been suppressed because there was no probable cause for his arrest and whether the trial court abused its discretion in denying defendant's motion seeking the identity of the informant. We also consider an issue raised in supplemental briefing: whether reversal is required as a result of the recent addition of section 1109 to the Penal Code,[1] a statute that requires a trial court to bifurcate trial of charged offenses and alleged gang enhancements when requested by a defendant.

## I. BACKGROUND

### A. *Ponce's Murder*

On August 3, 2016, victim Ponce was working as a traffic technician at a construction site near the intersection of 7th and Brooks Avenues in Venice, California. On that day, he was wearing a short-sleeved shirt, which revealed tattoos associated with a Hispanic gang, the Avenues.

At approximately 4:05 p.m., Michael Hughes (Hughes) and George Hewitt (Hewitt) were driving back to their office when they stopped at the intersection of 7th and Brooks. As their vehicle began to enter the intersection, they saw Ponce run in front of their car while being chased by a second man (later

---

[1] All undesignated statutory references that follow are to the Penal Code.

2

identified as defendant) wearing a black "hoodie" jacket, a mask that covered the lower half of his face, basketball shorts, and latex gloves. The man doing the chasing appeared to be five feet, eight inches to six feet tall and weighed between 160 to 190 pounds; based on the skin color of his legs, Hughes and Hewitt believed he was Black.[2]

As Hughes and Hewitt watched, the masked man shot Ponce once in the back from point-blank range with a large, chrome-plated handgun. Ponce fell to the street in front of their vehicle, and Hughes and Hewitt saw the assailant shoot him a second time. The shooter, after tucking the handgun into the waistband of his shorts, fled the scene by running west down the 600 block of Brooks Avenue. Hughes backed his vehicle out of the intersection, drove around Ponce, parked, and called 911.

Ruben Barreda (Barreda), Ponce's friend and co-worker, heard the gunshots and ran to the intersection of 7th and Brooks Avenues. Barreda found Ponce lying face down in the street with two gunshot wounds, one to his back and one to his head. After turning Ponce over and seeing he was dead, Barreda covered Ponce's face with his safety vest.

B.    *The Investigation Preceding Defendant's Arrest*

One of the first police officers to arrive at the crime scene, a gang enforcement officer for the Pacific Division of the Los Angeles Police Department (LAPD), observed Ponce's gang tattoos and advised the investigating detectives that a gang

---

[2]    Defendant is Black and, at the time of his arrest, one of the detectives investigating Ponce's murder estimated he is five feet, nine inches tall and documented his weight as 188 pounds.

3

motive might be behind the shooting. When interviewed by detectives, Barreda, an Avenues gang member, stated there had been "tension" between the construction workers and individuals who might have been local gang members.

Immediately following Ponce's murder, LAPD officers interviewed Hughes and Hewitt and began canvasing the neighborhood in search of additional witnesses, as well as surveillance video. One witness interviewed by police on the day of the shooting and by detectives the following day was Matthieu Popesco, who, at approximately 3:55 p.m., observed a Black man, who appeared to be between five feet eight inches and five feet 10 inches tall, walking in the area of the shooting. The man was wearing a black hoodie and light-colored basketball shorts, and the man's face was covered by what looked like a bandana, which struck Popesco as odd since it was a "very hot summer day" in 2016. Using Popesco's statement, police located surveillance footage depicting an individual who looked similar to the person Popesco described walking in the area about ten minutes before the shooting.

Another witness interviewed by police on the day of the shooting was Dustin Byhre, a man who lived in the area near where the shooting occurred. At approximately 4:00 p.m. (roughly five minutes before the shooting), Byhre saw a non-Caucasian man pass along the private walkway which ran along the side of his home. The man, dressed in a black hoodie and silver or gray shorts, was wearing a facemask which covered his nose and mouth. Thirty to sixty seconds after he saw the man in the hoodie, Byhre heard "unsettling" popping noises.

A little over three weeks after the shooting, police detectives spoke to witness James Gonzales (Gonzales). He said

4

he had seen defendant moments before the shooting at the end of the private walkway running along the side of the building where Byhre lived.[3]  Elaborating, Gonzales said he and his girlfriend Amber Lopez (Lopez) were riding their bicycles in the area and Gonzales saw defendant standing at the entrance to the walkway wearing a mask, a zip-up hoodie, and light-colored basketball shorts.[4]  Gonzales said he knew the man was defendant, notwithstanding the mask, because he had met and seen defendant on several prior occasions and recognized his eyes. The detectives showed Gonzales a photograph of defendant wearing a mask, and Gonzales confirmed the mask looked similar to what he saw defendant wearing on the day of the shooting. Gonzales also told the detectives that, after seeing defendant, he and Lopez rode their bicycles to the home of Brandon Washington (Washington).

The detectives subsequently interviewed Washington, one of defendant's cousins and a member of the Venice Shoreline Crips—a street gang that claimed territory near the shooting.  At the time of the shooting, Washington lived around the corner from the intersection where Ponce was shot.  Washington said he

---

[3]      At the time of his interview with detectives, Gonzales had been arrested for petty theft; he offered information about the Ponce murder in exchange for leniency from law enforcement. After being interviewed, Gonzales was released from custody and was not prosecuted for the petty theft offense.

[4]      Detectives interviewed Lopez after arresting defendant. She confirmed she saw a masked Black man in the area moments before Ponce was shot.  She reluctantly identified defendant (who she had known for years) as the man she saw.

saw defendant on the day of the murder about a block from the crime scene and near where Ponce had been working most of the day.

Police detectives obtained surveillance video from two stores near where the shooting occurred, a Rite-Aid pharmacy and a Ralph's grocery store. The videos depict defendant in the area just over an hour before the shooting. Defendant is wearing a blue hat, a white t-shirt, and carrying a backpack, and the backpack appears to have an item of clothing with a black drawstring, which could be a black hoodie, hanging from one of its straps. Detectives also obtained photographs from defendant's social media accounts, which, among other things, showed him wearing a mask and a black hoodie. Based on the photographs from defendant's social media accounts, police determined defendant was a member of the Venice Shoreline Crips.

C. *Defendant's Jail Cell Conversation with the Informant and Interviews with Police*

In March 2017, seven months after Ponce's murder, the investigating detectives directed other officers to arrest defendant. The arrest was not made pursuant to an arrest warrant. Later that same day, following the arrest, the detectives conducted a "*Perkins* operation,"[5] in which defendant was placed in a holding cell with a paid police informant.[6] The

---

[5] *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

[6] In advance of defendant's arrest, police prepared for the *Perkins* operation by taking the following steps: identifying a suitable informant (in this case, an individual who had previously been incarcerated), confirming the informant did not know

6

conversation between defendant and the informant was video- and audio-recorded, and it was also monitored "live" by the detectives from a nearby "listening post" in the police station.

During his jail cell conversation with the *Perkins* informant, defendant made a number of incriminating statements. Defendant admitted he was a member of the Venice Shoreline Crips. Without identifying Ponce by name, defendant told the agent he shot Ponce "close up." When asked about what happened to the pistol he used in the shooting, defendant said the gun was supposed to be buried and he told only one person about its location. Defendant said he did not think he left any DNA at the crime scene because he was wearing latex gloves. Defendant also stated he did not return to the crime scene after the police arrived, he burned the clothes he was wearing, and he threw his shoes in the trash.

Police detectives themselves also interviewed defendant twice on the day of his arrest: once before he was placed in the cell with the informant and a second time while the *Perkins* operation was underway. The detectives regarded each of their interviews with defendant as a "stimulation"—an event which was designed, at least in part, to provoke conversation between defendant and the informant about the crime. Both of these interviews were audio-recorded; the second was also recorded on video.

---

defendant, briefing the informant on the basic facts of the case, and providing him with authenticating documentation (e.g., a wristband with a booking number and a "pink slip" booking sheet) that would make the informant appear to defendant to be a bona fide detainee.

7

During the first interview, which took place at the police station where defendant was brought immediately following his arrest, the detectives advised defendant he was being charged with Ponce's murder. In response, defendant demanded to know how his name became connected with the murder. During the second interview, which was conducted at another police station (the one where the *Perkins* operation took place), detectives revealed a witness had seen him in the area of the shooting moments before it occurred. Although defendant repeatedly denied killing Ponce, he did say he grew up in the area where the shooting occurred and would cut through many yards in that neighborhood. Defendant also admitted to being in the neighborhood on the day of the shooting and he said he shopped at Ralph's. Defendant also allowed it was "possible" he stopped by his cousin Washington's house sometime on the day of the shooting.

### D. Pre-Trial Proceedings

The Los Angeles County District Attorney charged defendant with murdering Ponce. The information against defendant included firearm and gang allegations. (§§ 12022.53, subds. (b)-(d), 186.22, subd. (b).)

Prior to trial, defendant filed two motions related to the *Perkins* operation. The first was a motion pursuant to section 1538.5 that sought suppression of all evidence collected following defendant's arrest—most significantly, the recordings obtained via the *Perkins* operation. The second was a motion that sought the identity of the *Perkins* informant. (The resolution of these motions are the principal grounds for reversal urged on appeal.)

8

### 1.    *Defendant's motion to suppress*

Defendant argued his arrest was made without probable cause.  As defendant saw it, the only evidence connecting him to the crime at the time of his arrest was "unreliable, multiple hearsay."  The prosecution opposed the motion, relying on the statements by Popesco, Byhre, Hewitt, Hughes, Gonzales, and Washington, as well as the surveillance video footage and photos obtained from defendant's social media accounts.

The trial court held an evidentiary hearing on the motion to suppress.  After stipulating defendant was not detained pursuant to an arrest warrant, the only witness to testify was Tyler Adams (Adams), one of the lead detectives on the investigation.  Adams testified he ordered defendant's arrest based on Ponce's gang affiliation, his consultation with gang officers familiar with the Venice Shoreline Crips, his interview of witnesses, and his review of surveillance video and postings to defendant's social media accounts.[7]  The trial court denied the motion to suppress, finding under the totality of the circumstances that the arrest was premised on probable cause.  The court relied in particular on the evidence establishing that defendant was near the crime scene shortly before the shooting and that defendant owned and wore masks.

---

[7]    Adams acknowledged he provided "very little" information developed during the murder investigation to officers tasked with finding and arresting defendant.  Adams testified: "They knew he was wanted for murder.  They had a description, rap sheet, and they would have had some of the basic information" used to obtain a search warrant for defendant's person and certain vehicles.

### 2. *Defendant's motion to identify the* Perkins *informant*

Defendant premised his motion to obtain the identity of the *Perkins* informant on the quality of the audio-recording. As defendant argued it, "much of what is heard and attributed to [defendant], is either unintelligible or it is of such poor resonance as to be subject to interpretation. . . . There are only two people who can clarify these unintelligible, interrogation responses—[defendant] and the *Perkins* informant. It won't be [defendant]."

The prosecution opposed the motion. Discovery of the *Perkins* informant's name was not warranted because defendant had not and could not show that the informant would provide exonerating evidence or that the nondisclosure of the informant's name would deprive defendant of a fair trial. The *Perkins* informant was not a percipient witness who saw the crime and the prosecution argued defendant had the recordings and could provide his version of any unintelligible portions.[8]

The trial court denied the motion to discover the identity of the informant. The appellate record before us does not include a reporter's transcript of a hearing on defendant's motion.[9]

---

[8]     At the hearing on the motion to suppress, the trial court advised defendant he would be able to review the transcript of the *Perkins* operation and submit proposed corrections. In October 2018, three months after the hearing on the motion to suppress, defendant submitted a list of corrections to the transcript.

[9]     We granted defendant's motion to augment the record with transcripts from a hearing held on May 11, 2018, and an in camera proceeding conducted on July 20, 2018. Neither of these

*E.      Defendant's Conviction*

At trial, the audio and video recordings of the *Perkins* operation, as well as the recordings of the police interviews of defendant conducted before and during the *Perkins* operation, were played for the jury with accompanying testimony by a police detective. Defendant did not testify and presented only one witness: his attorney's investigator, who testified that mirrored sunglasses, wrap-around masks, and hooded sweatshirts, similar to what witnesses described the shooter wearing, were readily available for purchase by members of the public.

The jury found defendant guilty of first degree murder and found true the firearm allegations.  Pursuant to the prosecution's request, the trial court dismissed the gang allegation in the interest of justice after the jury was unable to reach a verdict. The court sentenced defendant to 50 years to life in prison.

## II.  DISCUSSION

The three arguments made by defendant for reversal lack merit.  The trial court did not err in finding defendant's arrest supported by probable cause.  When considering the collective knowledge of the investigators, which is the appropriate analytical framework, the witness statements (including Gonzales's statement that he saw defendant steps from the murder scene seconds before the murder in attire worn by the shooter), surveillance video footage, and social media posts by

---

supplemental transcripts includes any substantive discussion of defendant's motion to discover the identity of the *Perkins* informant.

11

defendant established the requisite fair probability that a crime was committed and that defendant committed it. The trial court also did not err when it denied defendant's motion for the identity of the *Perkins* informant. The *Perkins* operation was recorded, the trial court gave the defense an opportunity to make corrections to the transcript of that recording, and the informant was not a witness (in any respect) to Ponce's murder. The identity of the informant was therefore immaterial. Finally, as to the issue raised in supplemental briefing concerning the impact of recently enacted section 1109, we are unpersuaded reversal is required even assuming the statute applies retroactively to defendant. Most of the gang evidence introduced at trial would have been admissible as motive evidence in the trial of the charged offense even in the absence of the gang enhancement allegation, and the non-motive-related gang evidence (predicate crimes by the Venice Shoreline Crips and some testimony about the gang generally) was so limited and relatively insignificant as to be nonprejudicial.

A. *The Trial Court Did Not Err in Denying the Motion to Suppress*

"[I]n ruling on a motion under section 1538.5 the superior court sits as a finder of fact with the power to judge credibility, resolve conflicts, weigh evidence, and draw inferences, and hence that on review of its ruling by appeal or writ all presumptions are drawn in favor of the factual determinations of the superior court and the appellate court must uphold the superior court's express or implied findings if they are supported by substantial evidence." (*People v. Laiwa* (1983) 34 Cal.3d 711, 718.) "In determining whether, on the facts so found, the search or seizure

12

was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.) "On appeal we consider the correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145.)

The Fourth Amendment requires that a warrantless arrest be supported by probable cause. (*People v. Celis* (2004) 33 Cal.4th 667, 673 (*Celis*).) "Probable cause exists when the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person to be arrested has committed a crime. [Citation.] '[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts.' [Citation.] It is incapable of precise definition. [Citation.] '"The substance of all the definitions of probable cause is a reasonable ground for belief of guilt,"' and that belief must be 'particularized with respect to the person to be . . . seized.' [Citation.]" (*Ibid*.; see also *Kaley v. United States* (2014) 571 U.S. 320, 338 ["Probable cause, we have often told litigants, is not a high bar: It requires only the 'kind of "fair probability" on which "reasonable and prudent [people,] not legal technicians, act"'"].)

Under the collective knowledge doctrine, police officers may make arrests based on investigation undertaken by other investigators. (*Remers v. Superior Court* (1970) 2 Cal.3d 659, 666-667; accord, *People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1553 (*Ramirez*).) "[W]hen police officers work together to build 'collective knowledge' of probable cause, the important question is not what each officer knew about probable cause, but how valid and reasonable the probable cause was that developed in the officers' collective knowledge." (*Ramirez, supra*, at 1555.)

13

Arresting officers do not need to know the facts supporting their fellow officers' probable cause determination, but the underlying determination must supply a basis for arrest. (*Id.* at 1553, 1555-1556.) A court will "look[ ] to the 'total police activity' to test the constitutional reasonableness of the conduct in question." (*People v. Alcorn* (1993) 15 Cal.App.4th 652, 656.)

Defendant does not contend the police, collectively, did not have sufficient information to constitute probable cause to arrest him. And with good reason, for witnesses interviewed by the police and the surveillance video footage placed defendant near the scene of the crime shortly before Ponce was shot and revealed a person wearing the attire and mask (unusual back in 2016) defendant was seen wearing was Ponce's murderer. Instead, defendant's sole contention is that probable cause for the arrest was lacking because the incriminating evidence the police had developed at the time of defendant's arrest was not "in the possession of the officer(s) who actually arrested [defendant] at the time [defendant] was arrested."[10] That, however, misunderstands applicable law. The investigating detectives were not required to brief the actual arresting officers on all of the facts developed in the investigation to permit them to arrest defendant. So long as the police collectively had evidence establishing the requisite fair probability that defendant was Ponce's murderer at the time of defendant's arrest (they did), and so long as a request to effectuate the arrest came from a member of the police force in a position to know the requisite probable

---

[10]     Defendant does not argue the *Perkins* recording should have been excluded on *Miranda v. Arizona* (1966) 384 U.S. 436 grounds.

cause existed (it did), that is sufficient.[11]  (See, e.g., *Ramirez, supra*, 59 Cal.App.4th at 1555 ["[A]ppellant's contention the arresting officer must know the precise basis of his fellow officer's conclusion probable cause existed at the time of arrest does not find any support from California authorities. . . . [¶] In all the cases we have researched in which arrests were made based on the collective knowledge of police officers, no probable cause was held insufficient because the officer who ultimately executed the arrests did not have specific knowledge of the nature and extent of his fellow officers' conclusion probable cause was present"]; cf. *Lockridge v. Superior Court* (1969) 275 Cal.App.2d 612, 619 [ordering suppression where, unlike here, "the People have failed to prove 'not only that the collective knowledge of the investigating authorities justified the arrest, but that such knowledge was funneled to the arresting officer either by imparting it to him or, more simply, *by the giving of an order or request to make the arrest* by someone who, in turn, was possessed of such collective knowledge'"].)

---

[11]     At oral argument, counsel for defendant emphasized Adams testified at the suppression hearing that he briefed a joint LAPD-Federal Bureau of Investigation Fugitive Task Force and asserted the record does not reveal who precisely effected the arrest.  Insofar as defendant relies on ambiguity in the record on this point, and insofar as the ambiguity is even relevant, the ambiguity is attributable to the absence of any argument or objection on this ground in the trial court.  Defendant's trial attorney contested probable cause for the arrest solely because there was no physical evidence connecting defendant with Ponce's murder—just the arguably tainted testimony of Gonzales.

### B. The Trial Court Did Not Abuse Its Discretion by Denying Discovery of the Informant's Identity

A trial court must order the prosecution to disclose the identity of a person working confidentially on behalf of the police if the person is shown to be a material witness. (*People v. Lawley* (2002) 27 Cal.4th 102, 159-160.) "An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant. [Citation.] The defendant bears the burden of adducing "'some evidence'" on this score. [Citations.]" (*Ibid.*)

"Where the evidence indicates [an] informer was an actual participant in the crime alleged or was a nonparticipating eyewitness to that offense, ipso facto it is held he would be a material witness on the issue of guilt and nondisclosure will deprive the defendant of a fair trial. The proximity in time and space of the informer's relationship to the alleged crime readily tips the scales against the public interest in protecting the flow of information to law enforcement personnel. However, when the informer is shown to have been neither a participant in nor a nonparticipant eyewitness to the charged offense, the possibility he could give evidence which might exonerate the defendant is even more speculative and, hence, may become an unreasonable possibility." (*People v. Lee* (1985) 164 Cal.App.3d 830, 835-836; accord, *People v. Hardeman* (1982) 137 Cal.App.3d 823, 828 [the determination of whether an informant is a material witness "is predicated upon the relative proximity of the informant to the offense charged"]; *Williams v. Superior Court* (1974) 38 Cal.App.3d 412, 423 [the evidentiary showing for disclosure concerns "the vantage point from which the informer viewed

16

either the commission or the immediate antecedents of the alleged crime"].)

Here, defendant did not produce some evidence showing the *Perkins* agent could exonerate him. The informant did not know defendant prior to their jail cell conversation and was in no way involved with Ponce's murder. The *Perkins* operation itself was recorded, both via audio and video, and defendant given an opportunity to make corrections to a transcript of the recording.[12] Under the circumstances (and without some proffer from the defense about what specific testimony from the informant it hoped to elicit), there was no cause to compel discovery of the informant's identity. (See *People v. Wilks* (1978) 21 Cal.3d 460, 469 [informant, whose "sole relationship to the case was to provide partial justification for appellant's detention," was not a material witness because "'he simply point[ed] the finger of suspicion toward a person who has violated the law'"].)

Defendant nonetheless maintains the denial of his motion was still improper for a procedural reason. Specifically, he argues the trial court failed to comply with Evidence Code section 1042, subdivision (d), by not holding an "open adversary hearing" on his motion to discover the identity of the *Perkins* agent. So far as the record reveals, however, defendant did not object in the trial court to the absence of a hearing on the motion.[13] The point

---

[12]     The trial court also correctly instructed the jury that the recording, not the transcript, was the evidence it should consider and the jury must decide for itself what it saw and heard on the recording in arriving at a verdict.

[13]     In his motion for a new trial, for instance, defendant argued he was prejudiced by the "[d]enial of defense discovery

17

is accordingly forfeited.[14]  (See, e.g., *People v. Mungia* (2008) 44 Cal.4th 1101, 1140; *People v. Saunders* (1993) 5 Cal.4th 580, 589-590.)

      C.     *Section 1109 Does Not Require Reversal Because Most of the Gang Evidence Was Relevant to the Murder Charge and There Was Strong Evidence of Guilt*

While defendant's appeal was pending, the Legislature enacted Assembly Bill No. 333 (2021-2022 Reg. Sess.), which added section 1109 to the Penal Code.  That section requires a trial court, upon a defendant's request, to order that the crimes charged against him be tried separately from an alleged gang enhancement.  (§ 1109, subd. (a).)  Section 1109 does not, however, preclude introduction of gang evidence in a bifurcated proceeding where that evidence is relevant to proof of the charged offenses.  (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132 ["nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges"].)

At defendant's trial, Officer Robert Bechtol, a gang enforcement officer with LAPD's Pacific Division, testified as an

---

motions, specifically for the identity of the government agent placed in . . . defendant's cell to interrogate him," but he made no mention of any failure by the court to hold an "open adversary hearing" on his discovery motion.

[14]    Even if defendant had raised an objection in the trial court, his claim would still be forfeited because he did not raise the issue in his opening brief.  (*People v. Ng* (2022) 13 Cal.5th 448, 568, fn. 13.)

18

expert on criminal street gangs. He described for the jury the Venice Shoreline Crips' claimed territory, size, history, signs and symbols, and primary criminal activities (including narcotic sales and street robberies, which often escalate into assaults with deadly weapons and shootings). Two other LAPD police officers from the Pacific Division, which covers Venice, testified about the gang predicate crimes relied on by the prosecution: an assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)) and a conviction for possessing a loaded firearm (§ 25850). Officer Bechtol opined defendant was a member of the Venice Shoreline Crips and he further opined, based on a hypothetical question, that a crime committed under the circumstances shown by the evidence in this case would be gang-related.[15]

We need not decide whether section 1109 applies retroactively to defendant's nonfinal judgment because most of the gang evidence at issue—defendant's membership in the Venice Shoreline Crips and how a brazen, daylight killing of a member from a rival gang would benefit the Venice Shoreline Crips—was relevant to the underlying murder charge. (See, e.g., *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050; see also

---

[15]     After the close of evidence, consistent with CALCRIM No. 1403, the trial court instructed the jury that it (1) "may consider evidence of gang activity only for the limited purpose of deciding whether" defendant "acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and allegations charged" or "had a motive to commit the crimes charged"; and (2) "may not consider this evidence for any other purpose," such as "conclud[ing] from this evidence that [defendant] is a person of bad character or that he has a disposition to commit crime."

19

*People v. Montes* (2014) 58 Cal.4th 809, 859.)  The gang evidence that may not have been relevant (e.g., evidence of predicate crimes committed by other members of the Venice Shoreline Crips) was not so inflammatory as to sway the jury, which was presented with compelling evidence of defendant's guilt independent of any gang evidence plus an appropriate instruction limiting how it could use the gang evidence that was presented. There is accordingly no basis for reversal even if section 1109 were to apply retroactively.  (*People v. Tran* (2022) 13 Cal.5th 1169, 1208-1209 [unnecessary to decide whether section 1109 applied retroactively because any error in failing to bifurcate trial was harmless in light of the strength of the evidence against the defendant]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 480.)

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:



RUBIN, P. J.



MOOR, J.